**Michigan Supreme Court**
**Lansing, Michigan 48909**

# Opinion

Chief Justice
Maura D. Corrigan

Justices
Michael F. Cavanagh
Elizabeth A. Weaver
Marilyn Kelly
Clifford W. Taylor
Robert P. Young, Jr.
Stephen J. Markman

**FILED JULY 9, 2003**

PEOPLE OF THE STATE OF MICHIGAN,

    Plaintiff-Appellant,

v                             No. 121189

THOMAS DAVID CRESS,

    Defendant-Appellee.

_____

BEFORE THE ENTIRE BENCH

CORRIGAN, C.J.

We granted leave to appeal to consider whether the trial court abused its discretion in denying defendant's motion for relief from judgment on the basis of a new, third-party confession. We hold that the trial court did not abuse its discretion when it concluded that the third-party confessor was not credible and that the confession, therefore, did not make a different result probable on retrial. The trial court's decision necessarily hinged on determinations of credibility and was supported by the evidence. The Court of

Appeals impermissibly substituted its judicial opinion for that of the trial court. We thus reverse the judgment of the Court of Appeals and reinstate the trial court's order denying relief from judgment.

## I. FACTUAL AND PROCEDURAL HISTORY

In 1985, a jury convicted defendant of first-degree felony murder, MCL 750.316, in the death of seventeen-year-old Patty Rosansky. The victim's body had been found in a ravine covered by a refrigerator door. Two pieces of tree limbs were found in her throat, and the autopsy revealed that the cause of death was a brain injury resulting from one or more blows to the head with a club-like object. The victim had defensive wounds on her hands and extensive bruising on her legs. She was clothed from the waist up, but was naked from the waist down, with her underwear around her feet. There was evidence of forced anal penetration.

No physical evidence connected defendant to the murder and no eyewitnesses were identified. Rather, the case against defendant consisted primarily of the testimony of several witnesses to whom defendant had admitted murdering the victim.[1] Defendant took the stand and denied that he killed

---

[1]John Moore testified that he lived with defendant and heard defendant state in February 1983 after coming home in the evening, that "he felt a little better because he went and knocked off a piece." He testified that he also heard defendant say he had killed the victim.

the victim or that he had told anyone that he did so. He stated that he was delivering papers on February 3, 1983, and presented an alibi witness, Doug Moore. Defendant also presented the testimony of people who claimed to have seen the

_____

Terry Moore testified that he lived with defendant and that, in July 1983, defendant took Terry, his brother Walter, and Cindy Lesley to a wooded area and pointed out the location of the victim's body. The victim's body was later found in that location.

Candy Moore testified that defendant came to her house almost every day in the spring of 1983 and told her on two different occasions that he had killed a girl named Patty and put her in a ditch.

Emery DeBruine testified that in May 1983 defendant saw him in a bar and told DeBruine that defendant had raped and killed a girl because she refused to have sex with him. Defendant also said that it was a perfect crime and that no one would know about it.

Walter Moore, a convicted felon, testified that defendant had stated that he had picked the victim up and that they had smoked marijuana. Defendant wanted to have sex and when the victim refused, he raped her, killed her, and dumped the body in a wooded area.

Cindy Lesley testified that defendant had taken her out to the ravine where the victim was found and told her that he had killed the victim and left her body in the ravine after he covered her. Lesley called the police and eventually received a monetary reward.

Officers Nick Pestum and Marion Bagent testified regarding prior consistent statements of Walter Moore, Candy Moore, and Cindy Lesley, for the limited purpose of refuting defendant's charges that the witnesses were influenced.

Shirley House testified that she was the Moore family's landlady. She testified that when she was at the house repairing the steps, she heard defendant say, "I cannot believe that I got so hard up I had to kill the bitch for a piece of ass."

3

victim with a man other than defendant after the date she disappeared.

The Court of Appeals affirmed defendant's conviction on direct review. Unpublished opinion per curiam, issued February 4, 1988 (Docket No. 86748). This Court denied leave to appeal. 431 Mich 856 (1988).

In 1997, defendant filed a motion for a new trial on the basis of newly discovered evidence. Although defendant presented three separate arguments in support of his motion, the only argument at issue in this case is that Michael Ronning, an inmate in an Arkansas prison, had admitted murdering the victim.

Battle Creek Police Detective Dennis Mullen[2] first discovered Ronning's potential involvement while investigating another crime, an August 1982 murder. Ronning was initially reluctant to cooperate, but then agreed to confess to multiple murders in exchange for a transfer to a Michigan prison so he could be closer to his family. Ronning passed a polygraph test in which he admitted committing three homicides in Michigan. During the polygraph test, however, no questions were asked specifically about the murder in this case. In addition to taking the polygraph test, Ronning confessed to

_____

[2]Detective Mullen did not personally investigate this case.

4

the murder in this case.  In his confessions, Ronning claimed: (1) Rosansky, the victim, calmly got into Ronning's car without a struggle and crouched down on the floor while he drove her to Fort Custer; (2) once at the woods, Ronning had Rosansky remove all her clothes except her socks, and they smoked a joint; (3) Rosansky was not distressed, but was rather "quite comfortable" with him, even laughing and giggling; (4) he tried to have sex with Rosansky in the car, but specifically remembered that he did not and could not have sex because he "was too loaded up on drugs"; (5) he may have penetrated Rosansky's vagina with his fingers, but did not penetrate her rectum; (6) when they got out of the car, he followed Rosansky as she walked, holding on to her hair; (7) he strangled Rosansky with his left arm in a headlock-type hold for approximately four minutes; (8) Rosansky did not fight back or struggle in any way; and (9) after he thought Rosansky was dead, he stood over her and threw a rock at her head one time. Ronning also accompanied police on two unsuccessful attempts to locate the scene of the crime. Ronning later signed an affidavit attesting that he alone had murdered Rosansky.

The trial court originally granted defendant's request for a new trial on the basis of Ronning's confession. The court held:

It is important to note some observations concerning the trial testimony. There were no eyewitnesses to the murder of Patricia Rosansky. . . . There was absolutely no physical evidence linking the Defendant, Mr. Cress, to this crime. The only evidence connecting him to the crime was the testimony of several witnesses . . . all of whom testified that Mr. Cress had admitted to each of them his involvement in Ms. Rosansky's murder.

* * *

This Court has had the opportunity to review the videotaped statements of Michael Ronning in which he confesses to the murder of Patricia Rosansky. Parts of his statements agree with the established facts in this case, and parts of his statements may not agree with the established facts.

* * *

It appears to this Court that to deny the Motion for a New Trial in this case, one must be able to conclude that Mr. Ronning's confession is incredible, unbelievable, or simply unsubstantiated by the established facts. This I cannot do for several reasons.

First, there are portions of Mr. Ronning's statements which do conform to the established facts in this case. Second, although there are parts of his statements which may not be in conformity with the established facts, it must be noted that we are dealing with events which occurred 14 years ago. Given that lapse of time, it is possible that one's memory of some of the specific details may be sketchy. And finally, there is the testimony at the hearing of Battle Creek Police Detective Dennis Mullen.

Detective Mullen testified that he has been working on this murder case and two others since the 1980s. He stated under oath at the Hearing that he encouraged the Prosecutor's office to issue an arrest warrant against Michael Ronning for the murder of Patricia Rosansky. The testimony clearly

6

indicates that Detective Mullen, based upon his knowledge of the circumstances surrounding Patricia Rosansky's murder and his subsequent investigation, believes Mr. Ronning's confession is true.

It is obvious that Detective Mullen and the Prosecutor's Office have a difference of opinion concerning the believability of Michael Ronning's confession. That difference simply indicates to this Court that the Ronning confession cannot be summarily dismissed. Ultimately, at a new trial, the jury may believe Mr. Ronning and acquit Thomas Cress. On the other hand, the jury may totally reject Ronning's confession and convict Mr. Cress of Murder.

Considering the fact that at Mr. Cress' trial, there was no physical evidence connecting him to the crime; that his conviction was based solely upon the statements attributed to him by several prosecution witnesses; that some of those witnesses may have recanted their trial testimony; and that Mr. Ronning's confession cannot be deemed incredible or unbelievable, I believe that the Defendant has met his burden of establishing the four factors . . . required for granting a new trial . . . .

It will be up to a new jury to weigh all the evidence presented, including Mr. Ronning's confession, and then determine whether there is evidence beyond a reasonable doubt that Thomas Cress committed the murder of Patricia Rosansky.

The prosecutor applied for leave to appeal to the Court of Appeals. Defendant then filed a motion in the trial court "for evidentiary hearing and dismissal of the charges," claiming bad-faith destruction of evidence.

The Court of Appeals denied the prosecutor's application for leave to appeal and stated that the trial court had not abused its discretion in granting defendant a new trial.

7

Referring to evidentiary materials developed after the trial court's ruling, however, the Court noted that "denial of leave to appeal does not preclude a party from asking the trial court to revisit the merits of its order . . . based on information developed subsequent to such order," including evidence derived from the forensic testing of the decedent's remains following exhumation.

The prosecutor moved in the trial court to reopen the proofs regarding defendant's motion for a new trial. The prosecutor sought to present new evidence attacking the veracity of Ronning's confession and more evidence regarding the allegedly recanting prosecution witnesses. The trial court granted the prosecutor's motion. At the hearing, several prosecution witnesses testified that Ronning had told them that he falsely confessed to the victim's murder. Ronning testified that he killed Rosansky, but refused to answer any questions about the circumstances of the murder, claiming that to do so would somehow violate his agreement with the government. As a result, Ronning's confessions to the murder of Rosansky have never been given under oath, and have never been subject to the crucible of cross-examination.

After the hearing, the trial court vacated its December 1997 decision and denied defendant's motion for new trial. The court explained that it no longer found Ronning's

confession persuasive:

The evidence presented since the Court granted the Prosecution's Motion to Re-open Proofs has established overwhelmingly and convincingly that Michael Ronning is in fact a false confessor to the Patricia Rosansky murder. The primary reasons for this conclusion are as follows:

1. Mr. Ronning stated in his confession that he strangled Ms. Rosansky, and he demonstrated how he struck her one time with a rock to the back of her head. This Court heard from four expert witnesses concerning the blow(s) to her head: two Forensic Anthropologists . . . and two Forensic Pathologists . . . . . Some of the professional opinions of these witnesses are contradictory. When weighing this evidence, one must consider not only the expert's qualifications (all of which are impeccable), but one must also consider the underlying facts and circumstances giving rise to those opinions. After considering the expert testimony presented in this matter, this Court is convinced that there were in fact multiple blows to the head and neck of Patricia Rosansky. That fact finding is important because although Mr. Ronning is vague and claimed a lack of memory about many details in his description of the murder, he consistently claimed striking her in the head only one time. The expert testimony, whether it be the number of blows to Ms. Rosansky's head, or the presence of defensive wounds, or the lack of any evidence of strangulation, or the linear, rod-like shape of the object used to strike Ms. Rosansky, all rebut Mr. Ronning's version of the manner of Ms. Rosansky's death.

2. There were four people who testified in December, 1998, that at various times over the course of the last several years, Mr. Ronning confided in each of them that he was falsely confessing to this murder in order to do his prison time in Michigan. . . .

It was an acknowledged fact from the outset that Mr. Ronning had a motive to confess to the Rosansky murder. . . .

9

Of those four witnesses, Melissa Meyer was particularly persuasive. Mr. Ronning had been her guardian in 1983-84, and she had a close relationship with him. She testified that Mr. Ronning admitted to her that he had committed the murder in Arkansas. He also told her that his goal was to do his time in Michigan and that he had not committed the murder of Ms. Rosansky. She also testified that Mr. Ronning told her he had obtained information from the secretary of his Michigan attorney, had read some transcripts of the court proceedings in this matter, and had attempted to memorize the facts contained therein. She also testified, based upon her prior relationship with him, that Mr. Ronning is a very intelligent and a very manipulative person.

* * *

The testimony of these four witnesses is a direct attack on Michael Ronning's believability. It consistently establishes that Mr. Ronning's confession is self motivated and untrue. After considering the testimony of these four witnesses, their demeanor while testifying, and any motives which may have influenced their testimony, this Court finds that this evidence is credible and believable.

3. Perhaps the most compelling evidence which causes this Court to now conclude that Mr. Ronning is a false confessor comes from Mr. Ronning himself. In April, 1997, Detective Mullen and others had Mr. Ronning attempt to show them where the scene of the crime was. This was videotaped and admitted as Exhibit 54. Although there was evidence that Detective Mullen may have caused some confusion by using the wrong two-track to enter the area, eventually Mr. Ronning did come to an area where he believes the murder occurred. He stated on that videotape that there was a clearing where he could turn his car around. He described where the car would have been, where the body was placed after he strangled her, from which direction he would have thrown the rock, and how far the rock would have gone "with the roll."

The area Mr. Ronning stated "may very well be

10

the place" is shown on the videotape. Although Mr. Ronning qualified his identification of the crime scene by saying "this could be it" and "this has to be it, but I don't really recognize it per se," he nonetheless was firm and definite in stating that if the particular clearing they were in wasn't it, it nevertheless "was a place like this." The area where Mr. Ronning believes the murder occurred is a flat piece of ground, a clearing next to a two-track. There are no man-made landmarks in the immediate vicinity.

At the hearing in December, 1998, numerous photographs were admitted into evidence of the scene of the crime taken in 1983. Those photographs clearly show that Ms. Rosansky's body was not found in a flat, open area as described by Mr. Ronning. Rather, her body was found in a ravine. This ravine was not just a slight indentation in the ground. Each side rose to a height of seven or eight feet, according to the testimony of Trooper Zimmerman. The body was found at the bottom of the ravine, within view of a concrete well station. Mr. Zimmerman testified that the ravine and well station look similar in appearance today, compared to 1983. Indeed, Mr. Zimmerman testified that a metal roof vent shown in the 1983 crime scene photographs is still there. He had no difficulty locating the area where Ms. Rosansky's body was found.

When one compares the videotape of the area Mr. Ronning concludes was the scene of the crime (or as he said, "it was a place like this") to the photographs of the scene of the crime, the difference in topography and terrain is dramatic. This is not a situation where Mr. Ronning's recollection is clouded due to a lapse in time. On the 1997 videotape, Mr. Ronning describes the crime scene based on his recollection. When one compares his description of the crime scene to the actual crime scene, the only reasonable conclusion one can draw is that Mr. Ronning didn't know where the crime scene was because he did not commit the crime. Indeed, Mr. Ronning was shown the cement well station which is located at the beginning of the ravine about 40 feet from where the body was found. Mr. Ronning said he would have remembered

11

that well station if it had been visible from the scene of the murder.  Mr. Zimmerman testified it is easily observable.

The trial court further rejected its prior reliance on Detective Mullen's opinion that Ronning killed the victim, noting that other police agencies and detectives disagreed with Mullen that Ronning killed three young women in Michigan, including the victim.  The trial court also found it significant that Mullen did not investigate the victim's murder, speak with the state police who had initially investigated the victim's murder, read defendant's trial transcript, or speak with witnesses from defendant's trial or with defendant himself before reaching the conclusion that Ronning killed Rosansky.  The court concluded that "it would be inappropriate in effect to enhance the credibility of Michael Ronning based upon one investigating officer's professional opinion" because apart from Ronning's statement, "Detective Mullen's opinion that Mr. Ronning committed the Rosansky murder is based primarily upon his professional opinion and instinct, as opposed to any newly-discovered facts or evidence obtained during the course of his investigation." The court noted that Ronning "had the ability and opportunity over the years to obtain information from various sources . . . about relevant facts and circumstances surrounding the Rosansky murder . . . ."  The court denied defendant's motion

12

for new trial because it "no longer believes that a different result at a re-trial is probable."

The Court of Appeals reversed the trial court's denial of defendant's motion.[3] The majority held that the trial court erred in (1) finding that Ronning's confession lacked any probative value in establishing defendant's right to a new trial, (2) failing to address the fact that Ronning passed a polygraph examination during which he confessed to the Rosansky murder, (3) failing to consider evidence that several prosecution witnesses had recanted, (4) dismissing the fact that Mullen believed Ronning had committed the crime, and (5) failing to consider that the prosecutor may have destroyed potentially exculpatory physical evidence. The majority stated that although no medical experts had opined that the cause of death was strangulation, it could not be definitively ruled out as a cause of death. The majority remanded for a new trial, directing that the jury was to resolve whether the prosecutor intentionally or in bad faith authorized the destruction of potentially exculpatory evidence.[4]

---

[3]250 Mich App 110; 645 NW2d 669 (2002).

[4]The issue of bad-faith destruction of evidence has been resolved and is no longer before the Court. This Court remanded the case to the trial court for an evidentiary hearing concerning defendant's allegation of bad-faith destruction of evidence, clarifying that that issue was to be decided by the court and not a jury. 466 Mich 883 (2002). The circuit court filed its opinion and order on August 16,

The dissenting judge disagreed with the majority's conclusion that the trial court abused its discretion in denying the motion for a new trial. The dissent opined that although defendant had presented newly discovered evidence that was not cumulative, the trial court did not abuse its discretion in holding that the evidence would not render a different result probable upon retrial. Although the case was a "close call," 250 Mich App 161, and although the trial court's original decision that defendant *was* entitled to a new trial would not have constituted an abuse of discretion, great deference must be accorded to the trial court's assessment of the credibility of witnesses. The trial court did not make a mistake of law in its analysis of the new evidence. Although the veracity of the testimony of three prosecution witnesses had been questioned, four other nonrecanting witnesses had testified regarding "how defendant had admitted in graphic terms how he raped and killed the victim." 250 Mich App 162.

This Court granted the prosecutor's application for leave to appeal, limited to the issue "whether the defendant is entitled to a new trial on the basis that there is newly discovered evidence in the form of a confession by another to

2002, finding that the prosecutor's office did not engage in the bad-faith destruction of evidence.

14

the crime of which the defendant was convicted."[5]

## II. STANDARD OF REVIEW

This Court reviews a trial court's decision to grant or deny a motion for new trial for an abuse of discretion. *People v Lemmon*, 456 Mich 625, 648 n 27; 576 NW2d 129 (1998). A mere difference in judicial opinion does not establish an abuse of discretion. *Alken-Ziegler, Inc v Waterbury Headers Corp*, 461 Mich 219, 228; 600 NW2d 638 (1999). A trial court's factual findings are reviewed for clear error. MCR 2.613(C).

## III. DISCUSSION

We agree with the dissenting judge in the Court of Appeals that the trial court did not abuse its discretion in denying defendant's motion for a new trial on the asserted ground of newly discovered evidence.[6] For a new trial to be granted on the basis of newly discovered evidence, a defendant must show that: (1) "the evidence itself, not merely its materiality, was newly discovered;" (2) "the newly discovered evidence was not cumulative;" (3) "the party could not, using reasonable diligence, have discovered and produced the

---

[5] 467 Mich 889 (2002).

[6] Whether the dissent is correct that this case constitutes a "close call" is something that we need not address in light of our agreement that there was no abuse of discretion on the part of the trial court in denying defendant's motion.

15

evidence at trial;" and (4) the new evidence makes a different result probable on retrial. *People v Johnson*, 451 Mich 115, 118 n 6; 545 NW2d 637 (1996); MCR 6.508(D).

After considering the conflicts between Ronning's confessions and the facts established at trial, the trial court concluded that Ronning was not a credible witness and was a false confessor. A false confession (i.e., one that does not coincide with established facts) will not warrant a new trial, and it is within the trial court's discretion to determine the credibility of the confessor. *People v Simon*, 243 Mich 489, 494; 220 NW 678 (1928); *People v Czarnecki*, 241 Mich 696, 699; 217 NW 781 (1928).

Ronning's confessions sharply deviated from the established facts regarding the crime: (1) he stated that Rosansky did not struggle or resist, but the evidence at trial showed that she had defensive wounds and extensive bruising; (2) he stated that he strangled Rosansky, but the medical experts testified at trial that there was no evidence of strangulation and the cause of death was brain injury caused by blunt-force trauma to the head; (3) he stated that he hit Rosansky once with a round rock, while the medical evidence tended to show multiple blows with a linear, club-like object; (4) he did not mention the tree-limb pieces placed in Rosansky's throat; (5) he stated that Rosansky was almost

16

completely naked, wearing only her socks, when in fact she had been found clothed from the waist up; (6) he stated that he "specifically remembered" not having or being able to have intercourse with Rosansky and denied digitally penetrating her rectum, although the medical evidence showed evidence of forced anal penetration; and (7) he could not find the location where the body was found, even when that location was shown to him and despite the fact that he claimed that he left Rosansky's body in an area that he lived near as an adult.[7] Further, it was not disputed that Ronning had an incentive to confess, and several witnesses testified that he admitted that he fabricated the confession. Finally, Ronning also refused to testify regarding any details concerning Rosansky's murder at the evidentiary hearing, thereby casting doubt on whether he would testify at a new trial. In light of the above inconsistencies between Ronning's confession and the

---

[7] Further, as the prosecutor observed in his brief,

> Nor can Ronning's total inability to locate the scenes be attributed to a failed memory or a change in geography. This is so for the following reason[] . . . Exhibit 25, the map drawn by Michael Ronning clearly shows an area identified by Ronning as the crime scene and site of the body. The map places the scene and the body near the V. A. Hospital at Fort Custer. It actually appears to be right near the entrance to Fort Custer. The map is wrong. The map does, however, mirror Detective Mullen's testimony of what he told Ronning about where the murder took place . . . .

17

established facts, the trial court did not abuse its discretion in deciding that Ronning was a false confessor and that his testimony (even presuming he would testify at a new trial) would not make a different result probable on retrial. The Court of Appeals erred in substituting its judicial opinion regarding Ronning's credibility for that of the trial court. See *Alken-Ziegler*, *supra*.

Further, the Court of Appeals erred in holding that the trial court erred in not considering the polygraph-examination results. Although Ronning was questioned regarding the number of murders committed in Michigan, none of the polygraph questions specifically mentioned Patty Rosansky. Therefore, the results are simply irrelevant to a determination regarding the veracity of Ronning's confession to the Rosansky murder. The trial court did not abuse its discretion in refusing to consider the polygraph results.

Finally, the Court of Appeals erred in concluding that the trial court had impermissibly rejected Detective Mullen's testimony. The trial court's opinion demonstrated that the trial court heard and considered Detective Mullen's testimony. The court found that Detective Mullen's testimony was not likely to make a different result probable on retrial because (1) Detective Mullen was not involved in the Rosansky investigation; (2) other police agencies and detectives who

18

*were* involved in the investigation disagreed with Mullen that Ronning killed three young women in Michigan, including the victim; and (3) Mullen did not speak with those in the state police who initially investigated the victim's murder, did not read defendant's trial transcript, and did not speak with witnesses from defendant's trial or with defendant himself before concluding that Ronning murdered Rosansky.[8] The trial court did not abuse its discretion, and the Court of Appeals erred in merely substituting its view of the weight of Detective Mullen's evidence for that of the trial court.

## IV. CONCLUSION

The trial court did not abuse its discretion in denying defendant's motion for a new trial based on newly discovered evidence in the form of Michael Ronning's confession. Ronning's confession contradicted many of the established facts surrounding the Rosansky murder, and he told several witnesses that his confession was a lie. It was well within the trial court's discretion to find Ronning's confession

---

[8] According to Timothy Dixon, one of those who testified that Ronning told him that he was falsely confessing to the Rosansky murder, Ronning also told him that Detective Mullen was unknowingly giving Ronning information about the circumstances and details of the murder that he was merely stating back to investigators. See, e.g., n 7. In this regard, it is noteworthy that Detective Mullen apparently suspected Ronning of four murders, including that of Cheri Edwards, but only told Ronning about three of these murders, including Rosansky's. Ronning testified about only the three murders, not including that of Edwards.

incredible and to determine that he was a false confessor. It was similarly within the court's discretion to refuse to consider irrelevant polygraph evidence that did not refer to the Rosansky murder. Finally, the trial court did not abuse its discretion in concluding that Detective Mullen's professional opinion, in light of the factors surrounding the formation of that opinion and the above determination regarding Ronning's veracity, did not make a different result probable on retrial. The Court of Appeals impermissibly substituted its judicial opinion for that of the trial court. Therefore, we reverse the judgment of the Court of Appeals and reinstate the circuit court's denial of defendant's motion for a new trial.

Maura D. Corrigan
Elizabeth A. Weaver
Clifford W. Taylor
Robert P. Young, Jr.
Stephen J. Markman

20

# STATE OF MICHIGAN

## SUPREME COURT

PEOPLE OF THE STATE OF MICHIGAN,

    Plaintiff-Appellant,

v                                  No. 121189

THOMAS DAVID CRESS,

    Defendant-Appellee.

_____

CAVANAGH, J. (*concurring*).

    While I share the principles espoused by the dissent, because this Court's review is confined to the record and to the evidence therein, I cannot conclude that the trial court abused its discretion in refusing to grant a new trial.

                        Michael F. Cavanagh

# STATE OF MICHIGAN

## SUPREME COURT

PEOPLE OF THE STATE OF MICHIGAN,

    Plaintiff-Appellant,

v                                      No. 121189

THOMAS DAVID CRESS,

    Defendant-Appellee.

_____

KELLY, J. (*dissenting*).

I respectfully dissent because the record shows a significant possibility that defendant may be innocent. Consequently, the Court of Appeals majority did not clearly err when it held that the trial court abused its discretion in denying him a new trial.

This is a case in which there was no physical evidence that defendant committed the crime. After he was convicted, another person confessed to having done it. Law enforcement authorities destroyed evidence on which DNA tests could have been performed that might have exonerated defendant. And judges considering his appeal have disagreed about whether a new trial should be granted.

Surely there are here facts and circumstances that

justify a new trial.  The destruction of the DNA evidence is particularly troublesome in my view.  DNA evidence has become a prominent tool in our search for the truth in the criminal justice system.  For nearly three years, Congress has been considering the innocence protection act, which would create procedural rules governing when law enforcement authorities could destroy DNA evidence.  The bill, written by Senator Patrick Leahy of Vermont, has attracted bipartisan support and seeks to prevent exactly what occurred in this case.

Unfortunately, defendant does not have the benefit of legislation that would have prevented the destruction of the physical evidence gathered from the crime scene. We remanded the case to the trial court for an evidentiary hearing to determine whether the destruction was ordered in bad faith. In August of 2002, the court concluded that there was no evidence of bad faith.  I do not dispute this finding.  But the fact that the evidence may not have been destroyed in bad faith makes this situation no less devastating to defendant, if he is actually innocent.  He lost the possibility of exculpation.[1]  A new trial could remedy the loss.  At the

---

[1]This is not a remote possibility.  On June 17, 2003, in Macomb County, another Michigan prisoner was released from prison after being exonerated by DNA evidence.  Kenneth Wyniemko was wrongly convicted of robbery and rape in 1994, largely on the statements of witnesses and in the absence of physical evidence.  Here, the case against defendant was based

(continued...)

least, should defendant again be convicted, it would be done with due regard for the newly discovered evidence that has been uncovered.

Michael Ronning has confessed to the crime. He has been convicted of other murders. Of course, he may be lying when he maintains that he killed Patty Rosansky. But I believe that a jury should make that determination.

As the decisions of the courts below show, reasonable minds can differ regarding the proper course of action in this case. However, in my judgment, everything considered, this is an instance where judges abuse their discretion when they refuse to grant relief. I agree with the Court of Appeals that defendant should have a new trial. The aggregation of facts and circumstances has created a very real possibility that an injustice has occurred.

Marilyn Kelly

---

[1](...continued)
on similar evidence.