**Michigan Supreme Court**
**Lansing, Michigan 48909**

# Opinion

Chief Justice
Maura D. Corrigan

Justices
Michael F. Cavanagh
Elizabeth A. Weaver
Marilyn Kelly
Clifford W. Taylor
Robert P. Young, Jr.
Stephen J. Markman

**NOVEMBER 25, 2003**

PEOPLE OF THE STATE OF MICHIGAN,

    Plaintiff-Appellant,

v

No. 123414

HATTIE MAE TANNER,

    Defendant-Appellee.

_____

PER CURIAM

This case concerns when, under MCL 775.15, a defendant is entitled to have expert assistance appointed at public expense in a criminal proceeding. Defendant sought expert assistance regarding deoxyribonucleic acid (DNA) and serology evidence, even though the DNA evidence excluded defendant and the serology evidence suggested only that defendant was one of 2.9 million people who could have been the source of the blood found at the crime scene. Further, defendant failed to give any specific reason why this expert assistance was necessary. The trial court refused defendant's request, ruling that the appointment of an

expert was not necessary for defendant to safely proceed to trial. The Court of Appeals reversed defendant's conviction on the ground that she could not have safely proceeded to trial without expert assistance.[1] We agree with the trial court; therefore, we reverse the decision of the Court of Appeals and remand this case to the circuit court for reinstatement of defendant's conviction and sentence.

## I. Facts

### A. The DNA and Serological Evidence

In the early hours of March 22, 1995, bartender Sharon Watson was stabbed to death during a robbery at a bar. Hattie Mae Tanner first became a suspect in the case when the police learned that she spent the evening with a man who was one of the last people to see the victim alive.

When questioned by the police, defendant implicated herself. She admitted that a knife found at the bar "look[ed] like one of [her] knives" because of its unique characteristics. She also explained that her fingerprints would be on the knife because she had handled it three or four weeks before the homicide. Also, defendant admitted that she was on the bar premises that evening.

---

[1] 255 Mich App 369; 660 NW2d 746 (2003).

The physical evidence collected from the bar included the knife, a bloodstained napkin, a diluted bloodstain on the sink directly behind the bar, a bloodstained cloth, and, on the victim's shirt, six bloodstains. The prosecutor arranged for DNA and serological analyses of this evidence.

The DNA evidence excluded defendant.[2] Some evidence that could not be tested for DNA was subjected to serological testing for both blood type and phosphoglucomutase (PGM), an enzyme found in human blood.[3] This testing established that the diluted bloodstain found on the bar sink was of the same blood type and PGM subtype as defendant's blood. The prosecution's expert clarified, however, that a comparison of the two blood profiles did not confirm that the blood was defendant's. Rather, the evidence established that defendant and about four percent of the African-American population have the same blood profile. The prosecution's serology expert testified that

---

[2] DNA analysis of the blood on the knife and the napkin established a match with the victim's DNA profile; none of this blood matched defendant's DNA profile. Testing of the bloodstains on the victim's shirt revealed that the blood did not match the DNA profile of either the victim or defendant. These bloodstains, which originated from only one person, were attributable to an unknown female.

[3] There are four blood types, A, B, AB, and O, and there are ten PGM subtypes.

African-Americans constituted twenty-six percent of the United States population of 280 million people, and that "[p]ossibly millions" would have the same blood type and PGM subtype as defendant.[4]

### B. Circuit Court Proceedings

Defendant filed a pretrial motion under MCL 775.15 for expert assistance in DNA and blood typing. This statute authorizes payment for an expert witness, provided that an indigent defendant is able to show "that there is a material witness in his favor within the jurisdiction of the court, without whose testimony he cannot safely proceed to a trial . . . ." *Id*. If the defendant makes this showing, the judge "in his discretion" may grant funds for the retention of an expert witness. *Id*.

At the hearing, defense counsel informed the trial court that he did not want to retain an expert to reanalyze the blood samples or repeat the testing conducted by the prosecution's experts. He stated that he wanted an expert to help him better understand the DNA evidence and possibly to testify at trial. After the prosecution pointed out that the DNA evidence was exculpatory, defense counsel

---

[4] A calculation using these numbers indicates that slightly more than 2.9 million African-Americans share defendant's type and PGM subtype.

asked for money to "consult the DNA expert, and then based on that consultation if I can persuade you that some money should be kicked in for him to testify then we can revisit that area . . . ." The trial court denied the request.

The case proceeded to trial. The jury found defendant guilty of second-degree murder, felony murder, and armed robbery. The trial court sentenced defendant to life imprisonment for felony murder and vacated the other two convictions.

## C. The Court of Appeals Decision

Defendant appealed to the Court of Appeals, which vacated her conviction and remanded the case for retrial. The Court concluded that the "trial court erred in depriving defendant of expert assistance in the areas of DNA and serology because she could not otherwise proceed safely to trial without such assistance." 255 Mich App 404. It characterized the role of DNA and serology evidence in the case as "critical." *Id*. at 405. A DNA expert was needed so that defendant could "develop and argue the point that the DNA evidence exculpated her." *Id*. at 405-406. A serology expert was needed so that defendant could "defend herself against the effect" of the serology evidence, or "diminish its force by explaining that it constituted an anomalous test result." *Id*. at 406.

5

Further, the Court held that, without this expert assistance, defendant received a fundamentally unfair trial. Because it could not say that the error was harmless beyond a reasonable doubt, it reversed defendant's conviction and remanded for a new trial. The dissent stated that defendant had not shown that "the absence of an expert jeopardized her ability to prepare a defense," *id*. at 425, and that, therefore, the trial court's denial of defendant's motion did not result in a fundamentally unfair trial.

The prosecutor sought leave to appeal to this Court.

## II.  Standard of Review

This Court reviews a trial court's decision whether to grant an indigent defendant's motion for the appointment of an expert for an abuse of discretion. MCL 775.15. "A mere difference in judicial opinion does not establish an abuse of discretion." *People v Cress*, 468 Mich 678, 691; 664 NW2d 174 (2003).

## III.  Discussion

As MCL 775.15 makes clear, a trial court is not compelled to provide funds for the appointment of an expert on demand. In *People v Jacobsen*, 448 Mich 639, 641; 532 NW2d 838 (1995), this Court held that, to obtain appointment of an expert, an indigent defendant must

6

demonstrate a "'nexus between the facts of the case and the need for an expert.'" (Citation omitted.) It is not enough for the defendant to show a mere possibility of assistance from the requested expert. "Without an indication that expert testimony would likely benefit the defense," a trial court does not abuse its discretion in denying a defendant's motion for appointment of an expert witness. *Id.*

Because defendant failed to show a nexus between the facts of this case and the need for an expert, we hold that the trial court did not abuse its discretion in denying the motion. As the trial court recognized, the prosecutor's DNA experts testified that the blood in the bar and on the victim's shirt was not defendant's. The DNA evidence was entirely exculpatory. In fact, DNA analysis not only eliminated the possibility that the blood on the victim's shirt belonged to either defendant or the victim, it established that the blood belonged to an unidentified female. This favored defendant's assertion that she was not Watson's killer. Under these circumstances, defendant cannot show that she could not safely proceed to trial without a DNA expert.

Nor did defendant establish the need for appointment of an expert serologist. The serology evidence did link

7

defendant to the crime scene in a general sense, by establishing that the diluted bloodstain by the sink was left by one of possibly millions of persons who shared defendant's blood type and PGM subtype. But we agree with the Court of Appeals dissent that defendant did not establish that an expert serologist would offer testimony that would "likely benefit the defense," as is required by the statute. *Jacobsen*, *supra* at 641.

As the dissent stated, defendant did not seek to have the serology testing repeated. Nor did defendant argue that a serology expert might refute the conclusion that the blood found by the sink had the same blood profile as defendant's blood. At best, defendant has raised only the mere possibility that the appointment of a DNA and serology expert might have provided some unidentified assistance to the defense. This falls short of satisfying defendant's burden of showing that she could not safely proceed to trial without such expert assistance. We hold that the trial court did not abuse its discretion in denying defendant's motion.[5]

---

[5] For the same reason, the trial court did not abuse its discretion in denying appellate counsel's subsequent motion for the appointment of a serology expert.

8

IV.  Conclusion

Because defendant failed to establish a nexus between the facts of the case and the need for a DNA and serology expert, the Court of Appeals erred when it held that defendant could not proceed safely to trial without one. The trial court did not abuse its discretion in ruling that defendant was not entitled to such assistance under MCL 775.15.  Accordingly, we reverse the decision of the Court of Appeals and remand to the trial court for reinstatement of defendant's felony-murder conviction and sentence.[6]  MCR 7.302(G)(1).

> Maura D. Corrigan
> Michael F. Cavanagh
> Elizabeth A. Weaver
> Clifford W. Taylor
> Robert P. Young, Jr.
> Stephen J. Markman

---

[6] Our holding renders moot the Court of Appeals directive that, on retrial, the prosecution may not charge defendant with felony murder under an aiding and abetting theory.  Our review of the record confirms that, when the evidence is viewed in a light most favorable to the prosecution, the case was properly submitted to the jury on both theories of felony murder because a reasonable juror could find the essential elements of the crime proved beyond a reasonable doubt.  *People v Riley,* 468 Mich 135, 139; 659 NW2d 611 (2003).  We note that circumstantial evidence and reasonable inferences may be sufficient to prove the elements of a crime.  *People v Jolly,* 442 Mich 458, 466; 502 NW2d 177 (1993).

S T A T E   O F   M I C H I G A N

SUPREME COURT

PEOPLE OF STATE OF MICHIGAN,

    Plaintiff-Appellant,

v                                   No. 123414

MATTIE MAE TANNER,

    Defendant-Appellee.

_____

KELLY, J. (*dissenting*).

    I would deny leave to appeal in this case, leaving intact the Court of Appeals decision remanding for a new trial. The trial court abused its discretion in denying funds to the public defender for consultation with an expert in blood tests[7] to enable counsel to understand and meet the prosecution's evidence. Moreover, the error was not harmless. The evidence supporting the conviction was not as strong as the majority characterizes it. Because blood test data testimony was central to the case, the trial court's decision denied defendant a fundamentally fair trial. She is entitled to a new trial after appointment of an expert in blood tests.

    The record shows that the public defender who tried the case had a limited understanding of the prosecution's scientific evidence. He requested funds from the trial court to retain an expert witness to examine the data. The

_____

    [7]The blood tests in question include both DNA and serological tests.

court denied the motion because the DNA part of the data exculpated, rather than inculpated, defendant. Because counsel had limited knowledge of the science of DNA analysis, he failed to argue specifically for an expert to analyze the serological data. Also, he was unable to articulate why the defense needed an expert to examine the data.

The majority finds that the trial court decision was proper. It sets an impossible goal for defense counsel. If counsel fully understands the prosecution's scientific evidence, there would be no need for an expert to explain it. If, as here, counsel is not expert in certain scientific matters, the majority seems to require counsel to petition for funds for an expert using an expert's grasp of the subject matter.

Furthermore, the per curiam opinion characterizes the evidence of defendant's guilt as being stronger than it was. All defendant's statements to the police were not incriminating. Moreover, they were internally inconsistent. Defendant admitted having been in the bar several years before the slaying, but denied being there on the night in question. At trial, she admitted driving past the bar that night, but denied going in.

The prosecution's assertion that a knife found at the scene belonged to her was controverted and denied by defendant. She admitted that the picture of the knife she was shown had an altered tip similar to an alteration she had made to one of her knives. But she denied the knife was hers because it could not fold up.

There were substantial problems with the recording equipment that the police used to take defendant's statements. There were a large number of inaudible

2

responses. This raises the question of what exactly defendant admitted. Her statements, questionable in the accuracy of their transcription, could not have supported a conviction beyond a reasonable doubt.

The per curiam opinion adopts the prosecutor's statement that serological evidence narrowed the universe of suspects to more than two million people, hence hardly incriminating defendant. However, that evidence did not go to the jury in that form. Rather, the jurors were told that only four percent of black women, women like defendant, match the blood sample found at the scene.

This blood was the only physical evidence placing defendant at the scene of the crime. Therefore, the denial of funds to retain an expert to advise the defense, given the closely drawn evidence of guilt, was not harmless beyond a reasonable doubt. It was an abuse of discretion. For those reasons, I would remand for a new trial.

Marilyn Kelly