*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

JOSEPH ROBERT CLARK,

Defendant-Appellant.

UNPUBLISHED
September 26, 2024
12:49 PM

No. 365276
Wayne Circuit Court
LC No. 21-008455-01-FC

AFTER REMAND

Before: GARRETT, P.J., and RIORDAN and LETICA, JJ.

PER CURIAM.

This case returns to us after we remanded it to the trial court "for an evidentiary hearing limited to defendant's claim that trial counsel was ineffective for failing to investigate three witnesses." *People v Clark*, unpublished per curiam opinion of the Court of Appeals, issued April 11, 2024 (Docket No. 365276), p 13. On remand, the trial court denied defendant's motion for a new trial. Now, having reviewed the case in light of the evidentiary hearing and trial court's recent decision, we again affirm.

## I. FACTS

Our previous decision set forth the relevant facts of this case as follows:

This case arises out of an altercation at a family gathering on August 8, 2021, in Detroit, Michigan, which resulted in the shooting and injuring of Taijanai Salters. At trial, Taijanai testified that she went to a residence located at 2971 East Outer Drive in Detroit on August 8, 2021, to attend a family gathering. The residence belonged to Gwen Jones, who was the girlfriend of Taijanai's sister, Jadia Salters. Taijanai traveled to the residence with her younger brother, Laron Richardson, and his girlfriend. When they arrived, Taijanai saw a burgundy minivan belonging to her cousin, Sheaneen Coleman, parked in front of a

-1-

neighbor's house. Jadia pulled into Gwen's driveway in a white Journey. As Jadia pulled into the driveway, Sheaneen's burgundy minivan pulled up to Gwen's house and the following passengers exited the minivan: Sheaneen; defendant, who is married to Sheaneen; Sheaneen's daughter, Brijanayy Coleman; Sheaneen's sister, Kanayy Byrd; and Janiyah Coleman, who is Sheaneen's and defendant's daughter. Taijanai's older brother Jaquayy, and sister Star, were also at the residence.

When defendant walked up to the residence, Taijanai saw the black handle of a gun in the waistband or pocket of defendant's pants. Several people started to argue over a prior dispute between Taijanai's cousin Kevin Byrd and Jaquayy. As Jadia began to back out of Gwen's driveway in her white Journey, Taijanai heard someone say, "Snatch her out of the car." Taijanai saw Kanayy open Jadia's car door and hit Jadia. Jadia's vehicle was still in reverse when Kanayy hit Jadia, and the vehicle ended up on the grass. Taijanai's brother began fighting with Kanayy. Star tried to grab Kanayy. Brijanayy ran over to the altercation with a bat and hit Star on her head and shoulder with the bat. Taijanai tried to distance herself from the altercation because she was six months pregnant and did not want to get injured. Jadia drove across the neighbor's front lawn. Taijanai then observed Sheaneen driving her burgundy minivan over the curb. Defendant was standing on the grass near Sheaneen's minivan. Taijanai saw defendant look from left to right and then shoot her.

Taijanai testified that her right leg gave out and she fell to the ground after defendant shot her. Taijanai tried to get up but could not use her right leg. She saw a lot of blood on the ground. Star dragged Taijanai to the back of the house. Taijanai could not recall how many times defendant shot her but recalled hearing multiple gunshots from different kinds of guns. Police and emergency services arrived shortly after the shooting. Taijanai was taken by ambulance to Sinai-Grace Hospital where she received treatment for a gunshot wound and was released the same day. The bullet was not removed from Taijanai's leg.

Two videos depicting the altercation were admitted without objection as defendant's Exhibit 3 and defendant's Exhibit 4. Both videos were recorded by Janiyah, who recorded one continuous video and then split it into two parts. Defendant's Exhibit 3 depicts numerous individuals in the driveway of a residence, standing in a group and arguing. Defendant appears to be holding a black object in his left hand. Defendant and Taijanai's brother, depicted in multicolor jeans, walk up the driveway toward the back of the residence while Taijanai, a woman holding a baby, and a small child remain on the driveway near the front porch. Taijanai's brother in multicolor jeans appears to be holding a long gun in his right hand. Defendant, Taijanai's brother in multicolor jeans, and another individual stand near the driver's side door of a white minivan at the top of the driveway, which begins to slowly reverse out of the driveway. Defendant and Taijanai's brother walk down the driveway and toward the front porch. Taijanai's brother stands on the front porch and reaches into the front door of the house. Defendant follows Taijanai's brother onto the porch. The camera turns toward the street and the white minivan is depicted with its front tires on the sidewalk and its back tires on the grass strip

between the sidewalk and the street in front of the residence. The camera pans down to the grass and then back up to the white minivan, which drives across the lawn of the residence and stops near the front porch. Janiyah yells, "Kanayy, pull that bitch out the car!" The camera approaches the driver's side of the white minivan, where a woman in a white T-shirt with her midriff exposed is seen reaching into the open driver's side door and attempting to pull Jadia out of the vehicle. Star begins hitting the woman with her midriff exposed from behind. Brijanayy hits Star from behind with what appears to be a baseball bat. Brijanayy falls backward and continues to physically fight with Star. Defendant appears to try to intervene and falls down. The camera pans back to the driver's side of the minivan, where Taijanai's brother is physically fighting with the woman with her midriff exposed. Defendant approaches the driver's side of the white minivan and appears to have something black sticking out of his pocket.

Defendant's Exhibit 4 is a continuation of defendant's Exhibit 3. It depicts the white minivan with its front tires on the sidewalk in front of the residence and its back tires on the grass strip between the sidewalk and the street. The white minivan drives across the lawn and driveway and onto the lawn of the neighboring residence. Someone screams, "Oh my god, she just hit my f***ing sister!" Brijanayy is seen sitting on the grass strip between the neighboring residence's front lawn and the street. Defendant runs over to Brijanayy. A burgundy minivan is depicted driving across the front lawn of the residence toward Brijanayy and defendant. The burgundy minivan approaches the woman with her midriff exposed, who is walking across the driveway, and a loud boom is heard. The camera pans up to show the burgundy minivan driving across the driveway. The windshield appears to be broken. The burgundy minivan turns toward the street and another loud boom is heard. As the burgundy minivan pulls into the street, four loud popping sounds are heard. Defendant is seen standing in the street in front of a neighboring house in the direction the burgundy minivan was traveling. Approximately eight more popping sounds are heard as Janiyah moves up the driveway toward the back of the residence. Approximately four more popping sounds are heard.

On cross-examination, Taijanai acknowledged that she told an investigator that she did not know if defendant was trying to shoot at her or why she was struck. Taijanai testified that she watched defendant shoot her and did not have any uncertainty as to the identity of her shooter. Taijanai acknowledged that her brother appeared to be holding a weapon in his hand in a still shot taken from one of the videos of the altercation. Taijanai denied that her brother shot her. She testified, "If my brother shot me or I didn't know who shot me, I would just say I didn't know who shot me."

Forensic Technician Felicia Jackson testified that she was dispatched to 2971 East Outer Drive on August 8, 2021, at approximately 3:45 p.m. Jackson took photographs of the scene and collected shell casings. She collected an unspecified number of 9 mm Luger shell casings on the grass near a vehicle. She also recovered 10 "7.62" casings in the driveway toward the back of the house. She testified that

the 7.62 casings came from a large assault-type rifle. She also observed and photographed a broken window on the west side of the residence. She did not know whether the damage to the window was old or new, nor did she know how the window was broken. She recovered four or five shell casings in the driveway near the broken window.

Detective Yvette Garcia testified that she was the officer in charge of the investigation. She observed six 9 mm shell casings and an unspecified number of 7.62 shell casings on the ground at the scene. The 9 mm shell casings were located in the area where Taijanai said defendant was standing when he shot her, and Detective Garcia concluded from the location of the 9 mm shell casings that the person firing the gun was actively moving while firing. She testified that she has observed injuries from both 9 mm shell casings and 7.62 shell casings in her line of work. She testified that a 9 mm is a smaller caliber round and can get stuck in a person's body, while a 7.62 caliber round causes significant trauma to a person's body because a 7.62 caliber round can explode once it enters the body. She determined that defendant shot Taijanai because the 7.62 shell casings were leading up the driveway "almost side by side to the small drops of blood that were consistent with [Taijanai's] injuries" and, in Detective Garcia's experience, injuries from a 7.62 caliber round would have resulted in very heavy bleeding. She further testified that she observed Taijanai's injury, and it was not consistent with a 7.62 caliber round.

Detective Garcia attempted to interview Laron at the hospital, but Laron left the hospital so she was unable to interview him. She did not interview Jaquayy because she did not have contact information for him. She attempted to get contact information for Jaquayy from Taijanai but Taijanai told her that "there was not much involvement with Jaquayy" with respect to the shooting. Detective Garcia acknowledged on cross-examination that Jaquayy's involvement was greater than was described by Taijanai. No one told Detective Garcia that Jaquayy had a gun with him during the altercation. Detective Garcia acknowledged that Taijanai's brother appeared to be holding a long gun in a still shot taken from the videos of the altercation, and that some guns of that type fire 7.62 caliber rounds. Detective Garcia testified that Taijanai was not forthcoming with respect to who fired shots besides defendant, and the other witnesses were not forthcoming as to who was armed besides defendant. No guns were ultimately recovered in this case.

Defendant called Janiyah as a witness. Janiyah testified that defendant is her father. She was with defendant, her mother, her sister, her aunt, and her uncle at the residence on East Outer Drive on August 8, 2021. Taijanai, Jaquayy, Laron, Jadia, Star, and numerous children were also present at the residence. Janiyah began recording a video on her phone when she first walked up to the residence because she saw that Jaquayy had a gun, and she anticipated that something was going to happen. After Janiyah arrived, Taijanai and Sheaneen got into a verbal dispute over Facebook posts. Janiyah saw Jadia pull out of the driveway. She also saw Brijanayy hit Star with a baseball bat. Janiyah testified that she saw Brijanayy get hit by a vehicle and saw defendant go to her sister's aid. When Janiyah first

-4-

heard a gunshot, defendant was helping her sister to Janiyah's right, and the gunshots came from Janiyah's left. When the shots stopped, Janiyah ran to the corner of the street to get into Sheaneen's vehicle. Defendant, Sheaneen, Brijanayy, and Kanayy were already in the vehicle. They brought Janiyah's sister to the emergency room at Sinai-Grace Hospital because she was run over by a vehicle. Janiyah testified that defendant had a black cell phone at the time of the altercation.

During closing arguments, the prosecution argued, in relevant part, that defendant was standing where the 9 mm shell casings were recovered when he shot in the direction of the house, hitting and breaking one of the residence's windows. Trial counsel argued that the prosecution did not present any evidence that defendant had a gun with him when the altercation occurred. Trial counsel argued that when the gunshots started, defendant was giving aid to his daughter, who had just been run over by a car. In rebuttal, the prosecution argued that Taijanai's injury and the damage to the side of the house evidenced that someone was shooting in the direction of the house. The jury found defendant guilty of AWIGBH, carrying a firearm with unlawful intent, felon-in-possession, and three counts of felony-firearm . . . . [*Id*. at 1-5 (footnotes omitted).]

Defendant subsequently moved for a new trial or an evidentiary hearing, arguing, in relevant part, that trial counsel was ineffective for failing to interview or call as trial witnesses Sheaneen, Brijanayy, and Kanayy. In this regard,

[d]efendant attached to his motion affidavits from Brijanayy, Sheaneen, and Kanayy. In Brijanayy's affidavit, Brijanayy avers that the only person she saw with a gun on August 8, 2021, was Jaquayy. She further avers that defendant came to her aid after she was hit by Jadia's car. When they heard gunshots, defendant picked Brijanayy up, and they ran down the street to Sheaneen's vehicle. She avers that she was never contacted by trial counsel. In Sheaneen's affidavit, Sheaneen avers that she was present at the altercation on August 8, 2021, and heard gunshots while defendant was attending to Brijanayy after Brijanayy was hit by Jadia's vehicle. She further avers that she observed Jaquayy with a long gun and Laron with a pistol. She avers that she saw Laron shoot at her vehicle through her rear-view mirror and drove onto the grass to avoid the shots. Finally, she avers that she spoke with trial counsel but they did not discuss Sheaneen testifying, nor did trial counsel ask Sheaneen what she witnessed. In Kanayy's affidavit, Kanayy avers that she was present at the altercation on August 8, 2021, and saw Jaquayy with a long gun and Laron with a gun. She avers that "he" started shooting at her and her friends, but does not specify whether "he" refers to Jaquayy or Laron. She further avers that when she heard gunshots, she turned around and saw Jaquayy pointing his rifle at Brijanayy's car. Defendant was with Brijanayy when Kanayy heard the gunshots. Kanayy avers that she was never contacted by trial counsel. . . . [*Id*. at 5 (footnote omitted).]

The trial court denied the motion without holding an evidentiary hearing, reasoning that any testimony offered by these three witnesses would have been cumulative because Janiyah testified that Jaquayy had a gun at the time and that defendant was tending to his daughter when

the gunfire began. The trial court also reasoned that "[i]t may have been trial strategy not to call affiants as witnesses because of the roles they played in the dispute."

Defendant appealed, raising several issues. We affirmed the trial court in most respects but vacated its denial of the motion for a new trial with regard to the three witnesses without holding an evidentiary hearing, stating:

> In this case, defendant has set forth facts that require development of the record to determine whether trial counsel provided ineffective assistance by failing to conduct a reasonable investigation into witnesses Sheaneen, Brijanayy, and Kanayy. The defense asserted at trial was that defendant was not armed on August 8, 2021, and that Taijanai was shot by her brother. Because the trial court did not conduct an evidentiary hearing, the only record evidence of trial counsel's investigation into Brijanayy, Sheaneen, and Kanayy as potential witnesses are the affidavits attached to defendant's motion for a new trial. Brijanayy and Kanayy averred that they were never contacted by trial counsel regarding testifying at trial. Sheaneen averred that she spoke with trial counsel but they did not discuss Sheaneen testifying, nor did trial counsel ask her what she witnessed. Trial counsel stated during opening statement that defendant was with "his wife [Sheaneen], his two daughters [Brijanayy and Janiyah], and his wife's sister [Kanayy]" when the altercation occurred, which evidences that trial counsel was aware that these individuals were potential witnesses to the events in question. Moreover, a motion to exclude witness testimony filed by defendant's former counsel asserted that "[defendant] was on the ground tending to his daughter" when the gunshots are heard in the video recorded by Janiyah. Trial counsel had contact information for Sheaneen, at the very least, because he allegedly spoke with her prior to trial. Presumably, trial counsel could have obtained contact information for Brijanayy and Kanayy in the same manner that he obtained contact information for Janiyah. Thus, the record suggests that trial counsel knew that these individuals witnessed at least some portion of the relevant events on August 8, 2021, but did not interview the witnesses regarding what they observed.
>
> Further, the affidavits from the witnesses demonstrate that their testimony would have supported the defense theory at trial, which was largely unsupported by record evidence. Trial counsel argued that defendant did not have or use a gun during the altercation. . . .
>
> The prosecution argues, and the trial court found, that the testimony at issue here would have been cumulative because Janiyah testified that defendant was tending to his daughter's injuries when the gunshots were fired. We disagree. The affidavits supplied by defendant indicate that Sheaneen, Brijanayy, and Kanayy would have provided testimony that was central to the defense theory of the case and was not cumulative. It is true that Janiyah testified that she saw Jaquayy with a gun, but no evidence was presented at trial regarding the other averments of the affiants. Moreover, given the chaotic nature of the events on August 8, 2021, the different perspectives from which the witnesses observed the events on that date

could have provided valuable testimony as to events not observed by Taijanai, who denied seeing her brother with a gun, and Janiyah.

* * *

With respect to trial counsel's decision not to call Sheaneen, Brijanayy, and Kanayy as trial witnesses, the trial court found that "[t]here was testimony that the affiants were physically fighting with other party goers" and "[i]t may have been trial strategy not to call affiants as witnesses because of the roles they played in the dispute." We disagree. . . . The record evidence suggests that trial counsel did not interview Sheaneen, Brijanayy, or Kanayy regarding what they witnessed. No evidence was presented at trial that Sheaneen physically fought with anyone during the altercation. Though evidence was presented that Brijanayy and Kanayy were physically fighting with other people at the residence, it is unclear how this fact alone justifies trial counsel's failure to investigate what they witnessed to make a reasonable strategic decision to forgo their testimony due to their involvement in the altercation. Without interviewing these three witnesses to determine what they witnessed, trial counsel could not have exercised reasonable professional judgment about whether their roles in the altercation outweighed the value of their testimony when this case was, essentially, a credibility contest. . . . [*Id*. at 7-9.]

Accordingly, we remanded to the trial court for an evidentiary hearing while retaining jurisdiction. *Id*. at 13.

The trial court held an evidentiary hearing as directed. At the hearing, trial counsel testified that he was appointed to represent defendant shortly before trial, and he met with defendant and defendant's family multiple times to prepare for trial. Trial counsel explained that Sheaneen told him that she did not see the shooter, and she did not see defendant when the shots were being fired. Trial counsel further explained that he did not call Sheaneen to testify because, among other reasons, Sheaneen called the prosecutor's office in a separate case impersonating another individual and lying about factual matters in that case, and Sheaneen was discovered to have been delivering food to a location where defendant was allegedly hiding to avoid arrest in the instant case. Trial counsel noted that he successfully persuaded the trial court to preclude a jury instruction about the allegation that defendant sought to evade arrest, and "it would have been unprofessional of me to, after I got the judge to say that . . . to then put her on the stand to wait for the prosecutor to go, And, oh, by the way, isn't it right that there was a subpoena filed, a search warrant issued for Mr. Clark's location; and that you, in fact, were taking him items[?]"

With regard to Brijanayy, trial counsel testified that he listed Brijanayy as a trial witness, but that he was unable to contact her to determine whether she should testify at trial because, according to Sheaneen, Brijanayy had left the state. Trial counsel said that he asked Sheaneen "on numerous occasions, All right, if we need to bring this person, I need to know where she's at," but he "never got anything in terms of here's an address, here's a phone number, here's where she's at, just, 'She is no longer here. She's left the state.' "

Finally, with regard to Kanayy, trial counsel implied that he did not call her to testify because she would have added little information beyond the videos themselves.

Brijanayy testified that she was in the state during trial and that she was available to testify at the time. She explained that she did not actually see the shooter, but she did not observe defendant possess a gun during the event in question. Sheaneen testified that she provided trial counsel with contact information for Brijanayy, and she denied telling trial counsel that Brijanayy was out-of-town and unavailable. Lastly, Kanayy testified that defendant was not the shooter.[1]

At the conclusion of the hearing, the trial court again denied the motion for a new trial, reasoning:

> So which witnesses to call is definitely a matter of trial strategy. And [trial counsel] testified that with regard to the defendant's wife testifying, he knew there were issues with regard to the other case, and allegations that she had impersonated her mother in trying to get those charges dismissed involving the case with his mother-in-law, and that she had been kind of assisting the defendant in hiding when he had cut his tether and run, and that that might be an issue that came up if he were to call her as a witness.

> It would certainly taint her credibility in the eyes of the jury.

> * * *

> With regard to the daughter Brijanay, who was the one who was hit by the van, and that Janiyah testified the defendant went to help go get up, and everyone testified the defendant went to help to get in, Mr. Clark said -- or not Clark -- [trial counsel] was told by the defendant's wife that Brijanay had left the state and was not available to testify.

> * * *

> Brijanay said she was in the state of Michigan. She never left the state of Michigan. She said she was coming down, and that she saw Jaquayy with the big gun and his brother Laron with a small black gun, but she was on the ground when the shots were fired and couldn't tell who was shooting. And she said, sure, Dad helped her up off the ground.

> * * *

> And it's not clear that any of these witnesses told [trial counsel] that they saw Laron with a gun until after the defendant was actually convicted.

> And so for those reasons, I do find it's a matter of trial strategy. And he could not reach Brijanay. The only person he had a phone number, he said, was

---

[1] Before Kanayy began testifying, the trial court asked her whether she had gum in her mouth. Kanayy replied that she was "tongue-tied."

the defendant's wife, and she did not provide him with the information to reach Brijanay.

And the sister, Ms. Byrd, when she took the stand -- it was obvious -- she told us she's tongue-tied. She has a hard time speaking.

In speaking with her, defense counsel may have decided that it would be hard to call her to testify if it was hard for the jury to understand what she was saying as well. And there's also a point of diminishing return if you keep putting family members up, where they're saying the same thing to exonerate the defendant. . . .

This case was resubmitted to us following the trial court's ruling, and we invited the parties to file supplemental briefs addressing the merits of that ruling. *People v Clark*, unpublished order of the Court of Appeals, entered June 25, 2024 (Docket No. 365276). The parties have done so, and this case is now ripe for decision.

## II. DISCUSSION

"This Court reviews a trial court's decision to grant or deny a motion for new trial for an abuse of discretion." *People v Cress*, 468 Mich 678, 691; 664 NW2d 174 (2003). "The trial court abuses its discretion when its outcome falls outside the range of principled outcomes." *People v Armstrong*, 305 Mich App 230, 239; 851 NW2d 856 (2014). "A trial court's factual findings are reviewed for clear error." *Cress*, 468 Mich at 691. "A finding is clearly erroneous if, after reviewing the entire record, an appellate court is left with a definite and firm conviction that a mistake has been made." *People v Galloway*, 259 Mich App 634, 638; 675 NW2d 883 (2003).

"Whether a defendant received ineffective assistance of trial counsel presents a mixed question of fact and constitutional law." *People v Armstrong*, 490 Mich 281, 289; 806 NW2d 676 (2011). "A judge must first find the facts, then must decide whether those facts establish a violation of the defendant's constitutional right to the effective assistance of counsel." *Id.* (quotation marks and citation omitted). "We review the trial court's factual findings for clear error." *Id.* "We review de novo questions of constitutional law." *Id.*

"Criminal defendants are entitled to the assistance of counsel under both the Michigan and United States Constitutions." *People v Yeager*, 511 Mich 478, 488; 999 NW2d 490 (2023), citing Const 1963, art 1, § 20; US Const, Am VI. "This right guarantees the effective assistance of counsel." *Yeager*, 511 Mich at 488. "In order to obtain a new trial because of ineffective assistance of counsel, a defendant must show that (1) counsel's performance fell below an objective standard of reasonableness and (2) but for counsel's deficient performance, there is a reasonable probability that that outcome would have been different." *Id.* (quotation marks and citation omitted). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* (quotation marks and citations omitted). "The defendant has the burden of establishing the factual predicate of his ineffective assistance claim." *People v Douglas*, 496 Mich 557, 592; 852 NW2d 587 (2014).

"In examining whether defense counsel's performance fell below an objective standard of reasonableness, a defendant must overcome the strong presumption that counsel's performance

-9-

was born from a sound trial strategy." *People v Trakhtenberg*, 493 Mich 38, 52; 826 NW2d 136 (2012). "Initially, a court must determine whether the strategic choices were made after less than complete investigation, and any choice is reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Id*. (cleaned up). "Counsel always retains the duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Id*. (quotation marks and citation omitted). Moreover, "decisions regarding what evidence to present and which witnesses to call are presumed to be matters of trial strategy, and we will not second-guess strategic decisions with the benefit of hindsight." *People v Dunigan*, 299 Mich App 579, 589-590; 831 NW2d 243 (2013).

In this case, trial counsel testified that he met with defendant and his available family members multiple times to determine which witnesses to call in his defense. This indicates that trial counsel engaged in the necessary basic steps for a pre-trial investigation. Moreover, trial counsel's decision-making process regarding the witnesses to call, or not call, was sound and reasonable. As the trial court noted, concerning Sheaneen, trial counsel explained that she had credibility issues because she improperly sought to have the prosecutor dismiss other charges, and because she arguably assisted defendant in evading arrest. These issues would have undermined her testimony. In addition, trial counsel explained that calling Sheaneen to testify also would be problematic because it would possibly allow the jury to infer that defendant evaded arrest and thus had a consciousness of guilt. Given these concerns, it was entirely reasonable for trial counsel to decline to call Sheaneen to testify.

With regard to Brijanayy, there was a difference in testimony at the evidentiary hearing. Brijanayy and Sheaneen both testified that Brijanayy was in-state and available to testify at trial, while trial counsel testified that Sheaneen told him that Brijanayy was out-of-state and did not provide him with contact information despite multiple requests. The trial court found that trial counsel's testimony was more credible, stating that "he could not reach Brijanayy," and Sheaneen "did not provide him with the information to reach Brijanayy." "This Court defers to the trial court's superior position to evaluate the credibility of witnesses who testified before it." *People v White*, 331 Mich App 144, 150; 951 NW2d 106 (2020). Thus, because trial counsel was unable to contact Brijanayy despite attempting to do so, he can hardly be faulted for failing to call her to testify at trial.

Finally, with regard to Kanayy, the record is unclear as to why she was not called as a witness. Arguably, because appellate counsel failed to question trial counsel about why he did not call Kanayy as a witness, defendant has failed to satisfy his burden of proof in this respect. See *Douglas*, 496 Mich at 592. In any event, as the trial court astutely noted, Kanayy had trouble testifying in court, to the point where the trial court believed that she was chewing gum on the witness stand. It would have been reasonable trial strategy for trial counsel to decline to call such a witness to testify unless her testimony was critical for the case, which it was not, as the video recordings offered the most straightforward evidence. Further, as the trial court noted, "shell casings were found in the street on the other side of a car and are inconsistent with the testimony of everyone [including Kanayy] who said that the shots were being fired as they were running across the grass" or otherwise not fired in the street. In other words, Kanayy's testimony at the evidentiary hearing, which presumably is consistent with how she would have testified at trial, was not supported by the physical evidence. Thus, even if trial counsel performed deficiently by failing

to call Kanayy to testify at trial, there is not a reasonable probability that his failure to do so affected the outcome of trial, as her testimony was less than credible.

To summarize, the record supports the trial court's findings that trial counsel did not perform deficiently, and it also supports a finding that any deficient performance with regard to Kanayy was not prejudicial.

## III.  CONCLUSION

The trial court did not clearly err in its factual findings, nor did it err by concluding that defendant was not denied the effective assistance of counsel.  Therefore, the trial court did not abuse its discretion by denying defendant's motion for a new trial, and we affirm.


/s/ Kristina Robinson Garrett
/s/ Michael J. Riordan
/s/ Anica Letica