*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

       Plaintiff-Appellee,

v

KEVIN LYALL TOWER,

       Defendant-Appellant.

UNPUBLISHED
August 13, 2020

No. 347367
Mecosta Circuit Court
LC No. 95-003702-FH

Before: SHAPIRO, P.J., and SERVITTO and LETICA, JJ.

PER CURIAM.

Following a jury trial in 1996, defendant was convicted of two counts of first-degree murder and related lesser counts.[1] He is serving life sentences for the first-degree murder convictions. In 1999, this Court affirmed defendant's convictions on direct appeal. In the instant appeal, defendant challenges the trial court's order denying his successive motion for relief from judgment. In relevant part, the motion sought relief on the basis of a recanting affidavit of an alleged accomplice and trial witness, Rebecca Cochran. The trial court denied defendant's motion, without an evidentiary hearing, finding both that Cochran's recanting allegations lacked credibility, and further, even if the allegations were deemed credible, correction of the relevant portions of her trial testimony would not likely result in a different outcome on retrial. This Court granted defendant's delayed application for leave to appeal. Having considered Cochran's recanting allegations in light of the entire trial record, we affirm.

---

[1] Specifically, defendant was convicted of two counts of first-degree premeditated murder, MCL 750.316(1)(a), two counts of first-degree felony murder, MCL 750.316(1)(b), unlawfully driving away an automobile, MCL 750.413, forgery, MCL 750.248, uttering and publishing, MCL 750.249, and possession of a firearm during the commission of a felony, MCL 750.227b.

## I. FACTS & PROCEDURAL HISTORY

This Court's prior opinion provides the following convenient summary of the relevant facts of this case:

> This case arose out of the murders of defendant's uncles, Ron and Paul Tower, aged fifty-seven and forty-one, respectively, in July 1995. The Tower brothers were single, lived together at a farmhouse in Remus, Michigan, and were mentally impaired to varying degrees. Ron Tower could not read, could write only his name, was not gainfully employed but performed chores around the farmhouse, was diabetic and depended on his brother for medication, and was extremely shy. Paul Tower could read and write, was employed as a custodian, maintained and administered his own bank accounts, and owned two vehicles, a truck and a 1992 red Ford Escort. The Tower brothers were last seen alive on the afternoon of July 5, 1995, with defendant, at their farmhouse. On July 6, 7, and 8, 1995, withdrawals were made from Paul Tower's savings account in Big Rapids. On July 9, 1995, Paul Tower's red Escort was abandoned at an accident scene in Grand Rapids. A witness later identified defendant as the driver of that vehicle and as having fled the scene. On July 13, 1995, human blood and hair were found in various buildings at the Tower farmhouse. On that date, Mecosta County Sheriff's Detective Richard Rau interviewed defendant, and on the following day Rau arrested defendant for uttering and publishing and unlawfully driving away Paul Tower's Escort.
>
> On July 26, 1995, partially decomposed bodies matching descriptions of Paul and Ron Tower were found in a remote area of Mecosta County. Both had been stabbed and shot with a .22 caliber weapon. Around August 15, 1995, defendant was additionally charged with two counts of murder, felony firearm, and forging signatures on savings withdrawal slips drawn on Paul Tower's savings account on July 6, 7, and 8, 1995. Defendant was convicted as charged and his motion for new trial was denied. [*People v Tower*, unpublished per curiam opinion of the Court of Appeals, issued April 23, 1999 (Docket No. 203366), pp 1-2.]

The prosecutor's theory at trial was that defendant murdered his uncles, Ron and Paul Tower, and then took Paul's Ford Escort and used Paul's identification and banking documents to remove money from Paul's accounts in order to provide money and drugs to Heather Gallapoo, a teenage runaway and prostitute, in order to gain her affections. The prosecutor also charged Cochran with aiding or abetting defendant in the activity of withdrawing money from Paul's bank accounts. Cochran was a friend of Heather's and also a prostitute. At defendant's preliminary examination, Cochran's attorney elicited his client's testimony that she had not been offered any plea agreement, which the prosecutor later confirmed was accurate. Also at the preliminary examination, on questioning by the prosecutor, Cochran testified that after defendant's uncles disappeared, she had accompanied defendant to various banks to withdraw money from Paul's account. During some of these outings, the two drove Paul's Escort. Later, while alone in the car, defendant was involved in an automobile accident

with the Escort and informed Cochran of the accident.[2] Cochran further testified that she had seen a hunting knife in defendant's truck.

After the preliminary examination, while Cochran and defendant were both in jail, defendant wrote letters to Cochran and to Heather. Jail officials reviewed the letters. In the letters, defendant acknowledged the truth of Heather's and Cochran's preliminary examination testimony, except for Cochran's testimony about the knife. Defendant unsuccessfully moved to suppress the letters, which were admitted at trial as adoptive admissions under MRE 801(d)(2)(B). As a result, the jury was allowed to read the preliminary examination testimony of both Heather and Cochran. During trial, Cochran testified consistently with her preliminary examination testimony and again denied that she had a plea agreement with the prosecution. However, she was not questioned at trial about her alleged observation of a knife in defendant's truck.

Defendant filed motions for relief from judgment in 1999 and 2011, both of which were denied. In 2018, defendant filed a third motion for relief from judgment under MCR 6.502(G)(2). He argued that he had newly discovered evidence that Cochran had lied at the preliminary examination and trial about not having a plea agreement and lied at the preliminary examination about seeing a knife in defendant's truck. In support of his motion, he presented Cochran's affidavit recanting these portions of her preliminary examination and trial testimony. He also submitted an affidavit from Sharon Gallapoo, another witness at defendant's trial, which Gallapoo executed in 1996. This affidavit was prepared by George Nobel II, a private investigator working with defendant's attorney, who also provided his own statements along with Gallapoo's. The affidavit averred that Nobel spoke with Gallapoo on December 10, 1996, and Gallapoo told him that while she was outside smoking cigarettes during defendant's trial in 1996, she spoke with Cochran's mother, Melanie Vantuinen, who in turn stated that the prosecution had agreed that Cochran would receive time served in exchange for her testimony. Defendant presented a similar affidavit from Vantuinen, who stated that Cochran had told her about this agreement.

The trial court denied defendant's motion. The court found that Cochran's allegations in her affidavit were not credible, particularly considering the timing of events set forth in her affidavit, because she had already testified at defendant's preliminary examination on November 1, 1995, before the alleged meeting with the prosecutor and investigating officers at which she was allegedly offered a plea deal and pressured into testifying that she had seen a knife in defendant's truck. The court also found that even if Cochran's affidavit was true and her prior testimony related to the plea deal and knife corrected, it would not likely lead to a different

---

[2] The driver of the other vehicle involved in the accident also identified defendant as the driver of the Escort. The witness testified that he briefly confronted defendant after the accident, but defendant then fled the scene on foot.

outcome on retrial. This Court granted defendant's delayed application for leave to appeal the trial court's order.[3]

## II. ANALYSIS

Defendant argues that the trial court erred by denying his motion for relief from judgment, particularly without holding an evidentiary hearing regarding Cochran's recanting allegations. We disagree.

"We review a trial court's decision on a motion for relief from judgment for an abuse of discretion and its findings of facts supporting its decision for clear error." *People v Swain*, 288 Mich App 609, 628; 794 NW2d 92 (2010). Motions for relief from judgment are governed by MCR 6.500 *et seq*. *Id*. at 629. As a general rule, a defendant is entitled to file only one motion for relief from judgment. MCR 6.502(G)(1). However, MCR 6.502(G)(2) permits the filing of a successive motion under two limited circumstances: "A defendant may file a second or subsequent motion based on a retroactive change in law that occurred after the first motion for relief from judgment or *a claim of new evidence that was not discovered before the first such motion*." (Emphasis added). In this case, the trial court did not address whether defendant's claim of new evidence was discovered before defendant's first motion seeking relief from judgment.[4] The prosecutor does not argue that MCR 6.502(G)(2) was not met in this case or ask us to affirm the trial court on that basis. For those reasons, we will assume for purposes of this appeal that defendant's successive motion satisfied MCR 6.502(G)(2).

When MCR 6.502(G)(2) is satisfied the trial court "shall promptly examine the motion "together with all the files, records, transcripts, and correspondence relating to the judgment." MCR 6.504(B)(1). If upon such review, "it plainly appears from the face of the materials [presented] that the defendant is not entitled to relief," the trial court "shall deny the motion without directing further proceedings." MCR 6.504(B)(2). If it does so, the trial court "must include a concise statement of the reasons for the denial." MCR 6.504(B)(2). In this case, the trial court conducted this initial review, determined that no further proceedings were necessary, provided its reasoning and denied the motion for relief from judgment pursuant to MCR 6.504(B)(2).

---

[3] Defendant's application also raised a claim regarding the admissibility of the letters. However, this Court granted defendant's application "limited to the alleged recantation by Rebecca Cochran as presented in Issue I of defendant's leave application." *People v Tower*, unpublished order of the Court of Appeals, entered July 1, 2019 (Docket No. 347367).

[4] Cochran's claim regarding her testimony about the knife was clearly not discovered before the successive motion at issue in this case. However, defendant acknowledges that his private investigator was aware of the purported undisclosed plea agreement with Cochran in 1996, which is corroborated by the affidavit of Sharon Gallapoo, which she signed on December 10, 1996, before defendant's first motion for relief from judgment in 2005. Defendant now argues that while some of the evidence presented in his successive motion existed at the time of his first motion for relief from judgment, he could not have known that Cochran actually had an agreement to testify until she filed her recent affidavit.

-4-

To obtain a new trial based on a claim of newly discovered evidence, "a defendant must show that: '(1) the evidence itself, not merely its materiality, was newly discovered; (2) the newly discovered evidence was not cumulative; (3) the party could not, using reasonable diligence, have discovered and produced the evidence at trial; and (4) the new evidence makes a different result probable on retrial.' " *People v Johnson*, 502 Mich 541, 566; 918 NW2d 676 (2018), quoting *People v Cress*, 468 Mich 678, 692; 664 NW2d 174 (2003). The trial court decided defendant's motion based on the fourth element of the *Cress* test. "In order to determine whether newly discovered evidence makes a different result probable on retrial, a trial court must first determine whether the evidence is credible." *Johnson*, 502 Mich at 566-567. In *Johnson*, the Supreme Court explained the trial court's role in evaluating the credibility of newly discovered evidence:

> A trial court's function is limited when reviewing newly discovered evidence, as it is not the ultimate fact-finder; should a trial court grant a motion for relief from judgment, the case would be remanded for retrial, not dismissal. In other words, a trial court's credibility determination is concerned with whether a reasonable juror could find the testimony credible on retrial. [*Id*. at 567.]

"As a rule the court is not impressed by the recanting affidavits of witnesses who attempt to show that they perjured themselves at the trial." *People v Norfleet*, 317 Mich App 649, 661; 897 NW2d 195 (2016).

Defendant argues that the trial court erred by determining Cochran's credibility without an evidentiary hearing. The trial court did not consider whether an evidentiary hearing was required under MCR 6.508(B) because it decided defendant's motion pursuant to MCR 6.504(B)(2), as discussed. Typically, credibility determinations are made after live testimony. Indeed, we generally defer to a trial court's factual findings given "the special opportunity of the trial court to judge the credibility of the witnesses who appeared before it." MCR 2.613(C). However, in this case, Cochran's affidavit contained contradictions on its face. The affidavit states in part:

> 4. On August 29, 1995, my bond was violated for failure to maintain contact with detectives and I turned myself into the Sheriff's Department. I then remained in custody at the Mecosta County Jail until December 29, 1995.
>
> 5. From the moment of my first contact with detectives until being released on bond on December 29, 1995, I faced several intense interviews with detectives, including Detective Richard Rau. Prosecutor John B. Sullivan would sometimes also be present. . . . I testified at Kevin Tower's preliminary examination held on November 1, 1995.
>
> 6. In December of 1995, Mecosta County Chief Assistant Prosecutor John B. Sullivan visited me at the jail without my attorney being present. Prosecutor Sullivan convinced me that I would face a long prison sentence if I did not fully cooperate and fully cooperate meant me testifying favorably for the prosecution at Kevin Tower's trial. However, if I agreed to cooperate, I would be released on bond, be allowed to live with my aunt in Michigan's Upper Peninsula, be required to appear to testify against Kevin Tower, and I would not face any additional jail time.

7. The detectives and prosecutor told me I had to have known about a knife in Kevin's truck and about blood in the trunk of the car Kevin was driving. I was interrogated for two hours and they wouldn't let up. I finally agreed to testify and I said, "Fine, there was a knife in the truck." I was then bonded out of jail on another conditional "PR" bond without talking to my attorney.

Cochran's recanting allegation is patently unbelievable because the timing of events is internally inconsistent. Viewed in totality, the affidavit establishes the following timeline: Cochran's initial bond was revoked on August 29, 1995; she testified at the preliminary examination on November 1, 1995; she was bonded out again on December 29, 1995, after agreeing to testify that she saw a knife in defendant's truck. Thus, according to her affidavit, Cochran agreed to testify that there was a knife in defendant's truck *after* the preliminary examination. However, the preliminary examination was the only time she testified to that effect; she was not asked about that matter at trial. Further, we agree with the trial court's determination that there is insufficient evidence that a verifiable plea deal was in place either at the time of the preliminary examination or at the time of trial. Cochran testified both at the preliminary examination and at trial that she was not testifying pursuant to any plea agreement. The prosecutor also stated both at the preliminary examination and at trial that no agreement had been reached. Cochran's own attorney also confirmed that there was no plea agreement. To find Cochran's recanting testimony credible, the trial court would have to find not only that Cochran lied under oath, but that her lie was also known and endorsed by two officers of the court. Defendant has not presented any reason why the prosecutor or Cochran's defense attorney would suborn Cochran's alleged perjury by affirmatively confirming the truthfulness of her testimony on this point. In sum, the trial court did not clearly err by finding that Cochran's claim lacked credibility.

Further, defendant has not demonstrated that the newly discovered evidence would likely produce a different result on retrial. If a new trial were held, defendant presumably would expect Cochran to state that she was willing to testify pursuant to a plea agreement. The prosecutor could then present testimony or other evidence that no such agreement existed. Alternatively, defense counsel could cross-examine Cochran regarding the sentencing consideration she received for her testimony and use it to argue against her credibility. But Cochran has not recanted the substance of her trial testimony, in which she described how she went with defendant to multiple banks to obtain money from Paul's accounts using his identification, banking information, and documents. Indeed, Cochran's trial testimony was consistent, with one exception, with her preliminary testimony, the truth of which was effectively admitted to by defendant in his letter to Cochran stating that "everything you said [at the preliminary examination] was true, but this knife thing." The trial court did not clearly err by finding that testimony about the alleged plea agreement would not make a different result on retrial probable.[5]

---

[5] Defendant also argues that the prosecutor violated *Brady v Maryland*, 373 US 83; 83 S Ct 1194; 10 L Ed 2d 215 (1963), by failing to disclose the nature of any plea or immunity agreement reached with Cochran before defendant's trial. To establish a *Brady* violation, a defendant must show that "(1) the prosecution has suppressed evidence; (2) that is favorable to the accused; and (3) that is material." *People v Chenault*, 495 Mich 142, 150; 845 NW2d 731 (2014). "To establish

Nor did the trial court clearly by finding that Cochran's claim regarding the knife would not likely result in a different outcome on retrial. Again, Cochran did not testify to seeing a knife in defendant's vehicle at trial, so on retrial the question would be whether impeachment on this matter would lead to a different result. That is, Cochran would presumably answer negatively if asked whether she saw a knife in defendant's truck, and then defense counsel could impeach her with testimony at the preliminary examination. By way of explanation, Cochran would presumably testify that she was pressured by the prosecutor and detective to falsely testify that she saw a knife in defendant's truck. As discussed, however, the trial court did not clearly err by finding Cochran's claims patently incredible. That finding was supported by the internal contradiction of Cochran's claim, i.e., she testified about the knife before the alleged meeting where she claims she was pressured into doing so.

Moreover, defendant overstates the importance of Cochran's testimony at the preliminary examination that she saw a knife in defendant's truck. This information pales in comparison to the highly inculpatory evidence presented at trial clearly tying defendant to his uncle's Escort, including the evidence linking blood and a bloody shirt (the tears on which matched the stab wounds on Paul Tower) found inside the trunk of the Escort to the victims, as well as defendant's possession of Paul's identification and his other documents. In defendant's direct appeal, this Court also discussed other evidence tying defendant to the crimes, which included evidence of a .22-caliber rifle seized from defendant's home, blood and hair tissue found in a wheel barrow in Paul Tower's garage, shoe prints that were comparable to defendant's Nike shoes, and a tire track that matched a tire on defendant's truck. *Tower*, unpub op at 15-19.

Indeed, during closing argument, the prosecutor did not reference Cochran's preliminary examination testimony about seeing a knife in defendant's truck as proof that this testimony should be believed.[6] The prosecutor did mention Cochran's preliminary examination testimony, but only in connection with defendant's letters and his underlying admission that the remainder of Cochran's testimony was true concerning what the two did during the days they were together obtaining Paul's funds, and to show another connection to defendant and the Escort. With respect to the latter, the prosecutor tied Cochran's testimony to the fact that defendant called her on July 9, 1995, to tell her that he had been in an accident, and to use her testimony in connection with the items found in the car, such as Paul's wallet, checkbook, and savings account book. Cochran's

---

materiality, a defendant must show that there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *People v Dimambro*, 318 Mich App 204, 219; 897 NW2d 233 (2016) (quotation marks and citation omitted). For the reasons discussed, the alleged plea deal is not "material" such that there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." Accordingly, this claim also fails.

[6] Similarly, the prosecutor did not reference Cochran's testimony about seeing knife during opening statement. The prosecutor merely stated that defendant's letters indicated that he agreed with Cochran's preliminary examination testimony "save for one area."

other testimony could certainly be viewed as important to the charges against defendant. However, she has not recanted that testimony.

Because it plainly appeared from the trial testimony, trial evidence, and the other materials, taken together, that defendant was not entitled to relief, the trial court acted within its discretion when it decided defendant's motion without an evidentiary hearing.

Affirmed.

/s/ Douglas B. Shapiro
/s/ Deborah A. Servitto
/s/ Anica Letica