*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

TONIA JOYCE MILLER,

Defendant-Appellant.

UNPUBLISHED
April 8, 2021

No. 346321
Calhoun Circuit Court
LC No. 2002-003157-FC

AFTER REMAND

Before: GADOLA, P.J., and GLEICHER and STEPHENS, JJ.

PER CURIAM.

This case returns to us after remand for an evidentiary hearing regarding defendant Tonia Miller's motion for relief from judgment. Citing the testimony of four expert witnesses, the trial court found that newly discovered, noncumulative scientific evidence necessitated a new trial at which a different result was probable. The prosecution challenges this ruling, contending that the science underlying Miller's arguments is not new and has not gained general acceptance in the medical community. We affirm.

## I. BACKGROUND FACTS AND PROCEEDINGS

In 2003, a jury convicted Miller of second-degree murder arising from the death of her 11-week-old daughter, Alicia Duff. The prosecution claimed that Miller had violently shaken Alicia, causing a fatal brain injury. The prosecution's experts characterized three clinical findings as conclusive evidence of Miller's guilt: subdural blood, cerebral edema, and retinal hemorrhage. Miller presented an expert witness at trial who concurred that based on this triad, Alicia's death was due to shaken baby syndrome (SBS), now called abusive head trauma (AHT). The defense expert placed the time of the brain injury at a week before the child's death, but did not challenge the scientific validity of the SBS/AHT diagnosis. This Court affirmed Miller's conviction on direct appeal. *People v Miller*, unpublished per curiam opinion of the Court of Appeals, issued November 9, 2004 (Docket No. 249412) (*Miller I*).

-1-

In 2018, Miller filed a motion for relief from judgement under MCR 6.500, raising claims of newly discovered evidence and ineffective assistance of counsel. The trial court denied the motion. Miller sought leave to appeal in this Court and requested that we remand for an evidentiary hearing. We reversed the trial court's denial of Miller's motion and ordered an evidentiary hearing before a different judge, retaining jurisdiction. *People v Miller*, unpublished per curiam opinion of the Court of Appeals, issued August 6, 2020 (Docket No. 346321) (*Miller II*). Our opinion explained that Miller had produced affidavits from several medical experts from different disciplines attesting that Alicia had died due to fulminant pneumonia, and not AHT. *Id*. at 2. The experts averred that the science underlying the AHT diagnosis has evolved considerably since 2003, such that many physicians harbor now compelling doubts regarding the reliability of the "classical trio" of findings as confirmatory of child abuse. We summarized:

> Miller's eligibility for relief from judgment hinges on whether she can establish that the evidence on which she relies qualifies as newly discovered, and good cause for failing to raise the possibility of a competing pneumonia diagnosis or for neglecting to challenge the scientific reliability of the SBS/AHT diagnosis in 2003. Without an evidentiary hearing, the trial court could not evaluate these questions in an informed manner. [*Id*. at 6.]

On remand, the trial court conducted a two-day evidentiary hearing at which five expert witnesses testified, four on behalf of the defense. The testimony focused on two issues: the cause of Alicia's death, and whether the science surrounding the diagnosis of SBS/AHT had undergone a fundamental transformation, profoundly altering the way in which physicians approach the investigation of infant deaths such as Alicia's.[1]

The trial court explained in a lengthy bench opinion that Miller had established a "shift in the scientific consensus" regarding whether a presumptive diagnosis of AHT premised solely on the presence of the three findings remained scientifically valid. The court observed that this shift had resulted in a recognition among many physicians that "there are alternative reasons or alternative mechanisms that can cause those three findings to appear." Therefore, the court concluded, the science relied on by Miller was "newly discovered. . . . The evidence at trial was totally inconsistent with the conclusions of the four experts that have been presented by Ms. Miller." Applying the elements of the standard for granting a new trial based on newly discovered evidence set forth in *People v Cress*, 468 Mich 678, 692; 664 NW2d 174 (2003), the court continued as follows:

> Could this evidence have been discovered at the time of trial with reasonable diligence? I think it is pretty clear from the testimony of all of the experts that in 2003 there were very few experts that questioned the conventional teachings of the triad. Dr. Hunter acknowledged that those were the things . . . that he was trained that when those three things were evident, that steered you in a particular direction. And [trial counsel] consulted with two different experts and

---

[1] Miller's counsel conceded at the outset of the hearing that given the state of the science in 2003, her trial counsel had not performed ineffectively. Accordingly, we do not address that issue.

neither expert addressed an alternative conclusion. There was some discussion about, maybe, the timeline being different but not an alternative conclusion.

So, it - - the testimony of the four experts talked about how there has been a change but that - - at the time of trial, it would have been difficult if not impossible, for defense counsel to have been able to find someone who would have challenged the conventional wisdom/teaching of the triad being the - - the findings that send you down the shaken baby path.

Does the new evidence view - - the evidence viewed through a different lens, the shift in the science, make a different result probable? The Court has to look at whether or not this new evidence is patently incredible. There is not a need to prove that the original science was unreliable, only that there has been a shift in the understanding. Which would then call into question the verdict. So, the Court has to determine whether or not the evidence – the new evidence, the testimony of the experts and their opinion and what they based it on, was patently incredible.

I - - I can't find, based on my review of the witnesses, their testimony, their CV's, their position as it relates to this case or as it relates to other cases of [AHT] or [SBS], that they for - - barring a term of one of the local attorney's [sic], have a dog in that hunt. They don't seem to have a stake in whether or not the diagnosis remains - - in this case, remains in effect or not. They have given what appears to be a - - what I believe is conclusively a credible opinion, based on their careful and thorough review of all the facts of the case.

They reviewed - - their testimony was that they didn't just review a single facet of this case but they reviewed all of the evidence. They . . . all testified they reviewed even the evidence - - I think, maybe, or some of the trial transcripts as well. But . . . their testimony was based on their expertise. . . . [S]ome of them reviewed each other's findings to determine whether or not they were in agreement with the findings of the other experts. So, I don't see how - - the likelihood that the jury would find them patently incredible.

So, what would a reasonable jury make of the testimony? Would there - - what would the likelihood be - - the probability of a different outcome at trial? And I am not the trier of fact. I am just to determine whether a reasonable juror listening to the evidence presented by these experts and by the lay people as well, in support of the experts['] findings, would there be a probability of a different outcome?

It doesn't have to be guaranteed. And I think, based on the fact that the jury was given no other possible explanation for this child's death than [SBS] or [AHT] - - that was the only possible explanation they were given. The only different was there was some challenge to the timeline. So, I think a reasonable juror who is given the expert testimony of these four credible experts, giving them an alternative cause for this young baby's death. I think a different verdict is probable.

And I think, therefore, Ms. Miller has been successful in presenting evidence that calls into question the reliability of the verdict of the jury in this matter. And I think she has met her burden of proof of establishing the appropriateness of the Court granting her a new trial. And so, I do grant the motion and determine that based on the evidence that has been presented, I recommend that a new trial is granted for Ms. Miller, based on the new evidence of death by natural causes.

We permitted the parties to file briefs after the remand proceedings concluded. The prosecution now urges us to reverse the trial court, arguing that Miller has not sustained her burden under MCR 6.508(D). We turn to an analysis of the prosecution's arguments.

## II. NEW TRIAL

A new trial may be granted on the basis of newly discovered evidence if a defendant shows that: "(1) the evidence itself, not merely its materiality, was newly discovered; (2) the newly discovered evidence was not cumulative; (3) the party could not, using reasonable diligence, have discovered and produced the evidence at trial; and (4) the new evidence makes a different result probable on retrial." *Cress*, 468 Mich at 692 (quotation marks and citation omitted). "We review for an abuse of discretion a trial court's decision to grant or deny a motion for new trial." *People v Grissom*, 492 Mich 296, 312; 821 NW2d 50 (2012).

The prosecution asserts that the evidence underlying the trial court's decision was not "newly discovered" for three reasons: the medical findings remained unchanged; the expert testimony offered by Miller represents merely "a difference of opinion, not a sea change" in scientific understanding of the diagnosis of AHT, and Miller's experts' opinions "have not . . . gained general acceptance in the medical community."

The prosecution is correct in one respect. The physical evidence gathered during Alicia's hospitalization and at her autopsy has not changed. The medical records, CT scans, and pathological specimens evaluated by Miller's experts are identical to those available in 2003. Standing alone, however, that evidence supports neither innocence nor guilt, and would have been incomprehensible to the jury. Analogously, a genetic deoxyribonucleic acid (DNA) identification code exists within untested blood, but only the testimony of the scientist who unlocks the code is meaningful. Here, the evidence of consequence consisted of expert testimony linking the medical and autopsy findings to Miller's alleged conduct. Alternatively stated, Miller's conviction rested not on the admittedly unchanged physical evidence, but on the experts' interpretation of that evidence. The new interpretation—that Alicia's death was attributable to pneumonia and not shaking—was unknown to Miller's counsel, the trial court found, and not potentially available given the state of medical knowledge at the time.

In that sense, the testimony at the evidentiary hearing substantiates a two-fold "shift in scientific consensus." According to Miller's experts, the physicians who testified in 2003 ignored or discounted the evidence of pneumonia because they believed that the diagnostic triad, standing alone, established Miller's guilt. This blinkered approach led the experts at Miller's trial away from compelling evidence that the child suffered from severe pneumonia. The scientific

methodology underlying both the conclusiveness of the triad and the absence of another cause of death, the experts explained, has changed dramatically since Miller's trial.

The trial court found that a reasonably diligent defense attorney could not have produced the expert testimony on which Miller now relies because at the time of her trial, an overwhelming medical consensus deemed the presence of the diagnostic triad as conclusive evidence of child abuse. The evidence amply supports the trial court's conclusion.

As we pointed out in our previous opinion, in evaluating a motion for relief from judgment premised on newly discovered evidence, MCR 6.502(G)(3) focuses on whether "scientific consensus" has "shift[ed]." That court rule relates to the threshold requirement for filing *successive* motions for relief from judgment, providing in pertinent part and with emphasis added:

> (2) A defendant may file a second or subsequent motion based on a retroactive change in law that occurred after the first motion for relief from judgment or a claim of new evidence that was not discovered before the first such motion. The clerk shall refer a successive motion that asserts that one of these exceptions is applicable to the judge to whom the case is assigned for a determination whether the motion is within one of the exceptions.

> The court may waive the provisions of this rule if it concludes that there is a significant possibility that the defendant is innocent of the crime.

> (3) For purposes of subrule (G)(2), *"new evidence" includes new scientific evidence*. This includes, but is not limited to, shifts in science entailing changes:

> (a) in a field of scientific knowledge, *including shifts in scientific consensus*;

> (b) in a testifying expert's own scientific knowledge and opinions; or

> (c) *in a scientific method on which the relevant scientific evidence at trial was based*. [MCR 6.502(G) (emphasis added).]

Although MCR 6.502(G)(3) relates only to successive motions for relief from judgment, it logically follows that a shift in scientific consensus occurring after a final judgment of conviction similarly satisfies the "new evidence" standard under MCR 6.500.

At the time of Miller's trial, the experts assumed—based on the physical evidence and Miller's testimony—that Alicia had sustained a brain injury due to shaking. Our earlier opinion described:

> No one saw Miller shake Alicia, and Alicia had no external injuries or broken bones. Miller testified that as she was feeding Alicia formula from a bottle, Alicia began gasping for air and stopped breathing. The baby "arched backward" and formula came out of her nose, Miller recounted. Miller described that she shook the child "just enough to where she straightened [her] back out," agreeing with her counsel that her action was akin to "gentle prod[ding]" intended to get

-5-

Alicia to react. Miller vehemently denied that she shook her child violently or with an intent to injure her.

Alicia remained nonresponsive and Miller called 911. The child was transported to a hospital in Battle Creek and transferred to Bronson Methodist Hospital. Radiologic studies revealed a subdural hematoma and cerebral edema, and an ophthalmologist noted retinal hemorrhages. Alicia's attending physicians rapidly diagnosed her as a victim of shaken baby syndrome. She died the next day. [*Miller II*, slip op at 2.]

The three experts who testified at the trial (including the expert called by Miller) agreed that Alicia's subdural bleeding, cerebral edema, and retinal hemorrhages met the diagnostic criteria for SBS/AHT. Dr. Robert Beck, a pediatric intensivist who cared for Alicia at Bronson, asserted that "[t]here's really no other explanation typically found." The pathologist who performed the autopsy, Dr. Brian Hunter, as well as the pathologist called by Miller, Dr. Ljubisa Dragovic, agreed. No expert testimony presented at Miller's trial supported or even mentioned another potential cause of death.

At the evidentiary hearing, however, Miller's experts testified that the child's death was due to pneumonia, and not trauma. Dr. Francis Green, a pathologist specializing in lung diseases, testified that Alicia's death was due to "severe necrotizing pneumonia" that had been present for at least three or four days, and was "as severe as you can possibly get." Dr. Green highlighted that when Alicia was first admitted to the hospital following her collapse, her blood grew an organism "known to cause outbreaks of severe and fatal pneumonia in neonatal wards and hospitals." The lung specimens obtained at her autopsy revealed "severe necrotizing walking pneumonia" resulting from an infection that had spread from her lungs to her blood stream. Further evidencing an infection, Alicia's clotting mechanisms were disrupted, manifested by "quite extensive" hemorrhages in her kidneys. The pneumonia was so severe, and its consequences so widespread, that it could not have developed during Alicia's brief hospitalization, Dr. Green opined. He additionally pointed out that although Dr. Hunter had identified "acute bronchopneumonia and congestion" in his autopsy report, Dr. Hunter described almost normal lungs when he cut them. In Dr. Green's view, Alicia's lungs likely would have been "solid to the cut" due to their consolidation with infection. Dr. Janice Ophoven, a pediatric pathologist, agreed that Alicia had "a severe pneumonia," and that pneumonia rather than trauma caused the child's death.

Yet pneumonia had played no role whatsoever in the opinions of the experts who testified at Miller's trial. Trial counsel recollected that a juror actually inquired of Dr. Beck whether pneumonia could have explained why formula came out of Alicia's nose just before the child stopped breathing. According to counsel, Dr. Beck "denied that pneumonia was present." Counsel testified that neither of the two experts he consulted advised him that the pneumonia found during the autopsy was relevant to Alicia's cause of death.

Counsel's recollection harmonizes with Dr. Ophoven's explanation of why Alicia's deadly pneumonia qualifies as newly discovered evidence. "[S]tarting in the early 80's," Dr. Ophoven recounted, "it became routine that if a child presented to medical attention with significant brain damage and there was the presence of subdural blood, retinal hemorrhages, and brain swelling - - those three things," it was "routine" and "automatic" that the child would be diagnosed as a victim

-6-

of SBS/AHT. "And no other real aggressive or assertive exploration for an alternative explanation was undertaken," she added. In 2003, Dr. Ophoven asserted, SBS "was at its peak in terms of how often it was used to diagnose these cases." In Dr. Ophoven's view, Drs. Hunter and Beck "got it wrong because they didn't consider that it could be anything else. And that is where the error was made."

Miller's other two experts concurred that Alicia died due to severe pneumonia rather than head trauma. Dr. Roland Auer, a neuropathologist, provided detailed testimony explaining that the origins of Alicia's brain findings (cerebral edema, subdural bleeding, and retinal hemorrhage) were once believed to be pathognomonic for SBS/AHT. But in Alicia's case, the subdural bleeding began at her birth, Dr. Auer opined. The retinal hemorrhages were attributable to hypoxia caused by her pneumonia and the fact that when Alicia was first intubated, the endotracheal tube was improperly inserted. Brain swelling was an expected consequence of the hypoxia, Dr. Auer maintained. Dr. Julie Mack, a radiologist, concluded that Alicia's CT scan findings were consistent with hypoxic injury rather than trauma.

Given this evidence, the trial court did not clearly err by finding that there has been a "shift in the science." The prosecution counters that "the science underlying" that Miller killed Alicia by violently shaking her "continues to be supported" by a "consensus statement" published in Pediatric Radiology. The article was not discussed in any detail during Dr. Hunter's testimony, although it was admitted at the hearing by stipulation. Assuming that the article's contents were substantively admissible despite MRE 707,[2] the article's conclusions do not help the prosecution. The article recommends that "Each infant suspected of suffering AHT must be further evaluated for other diseases that might present with similar findings. The question to be answered is, 'Is there a medical cause to explain the findings or did this child suffer from inflicted injury?' " Choudhardy et al, *Consensus Statement on Abusive Head Trauma in Infants and Young Children*, Pediatric Radiology (May 23, 2018), p 13. This approach is consistent with that of Miller's experts, who claim that pneumonia, a medical cause explaining the other findings, was overlooked in 2003 because at that time, the diagnostic triad was viewed as infallibly reliable evidence of child abuse.

The prosecution failed to preserve its argument regarding the reliability of Miller's experts' testimonies by challenging it under MRE 702 in the trial court. The prosecution did not move for

---

[2] MRE 707 states:

> To the extent called to the attention of an expert witness upon cross-examination, statements contained in published treatises, periodicals, or pamphlets on a subject of history, medicine, or other science or art, established as a reliable authority by the testimony or admission of the witness or by other expert testimony or by judicial notice, are admissible for impeachment purposes only. If admitted, the statements may be read into evidence but may not be received as exhibits.

a *Daubert*[3] hearing and has not adequately briefed the issue in this Court; therefore, we decline to consider it.

In summary, the trial court did not abuse its discretion by determining that newly discovered evidence merits a new trial in this case.

We affirm and remand for proceedings consistent with this opinion. We do not retain jurisdiction.

/s/ Michael F. Gadola
/s/ Elizabeth L. Gleicher
/s/ Cynthia Diane Stephens

---

[3] *Daubert v Merrell Dow Pharm, Inc*, 509 US 579; 113 S Ct 2786; 125 L Ed 2d 469 (1993). "MRE 702 incorporates the standards of reliability that the United States Supreme Court articulated in *Daubert*[.]" *Elher v Misra*, 499 Mich 11, 22; 878 NW2d 790 (2016).