*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

EARL ALLEN NORTHROP, JR.,

Defendant-Appellant.

UNPUBLISHED
September 29, 2025
3:01 PM

No. 366293
Sanilac Circuit Court
LC No. 12-006961-FC

Before: MARIANI, P.J., and RIORDAN and FEENEY, JJ.

PER CURIAM.

Defendant appeals by leave granted[1] the trial court's order denying his successive motion for relief from judgment (MFRJ). In 2013, a jury convicted defendant of the following offenses for the sexual abuse of his daughter, JN: three counts of first-degree criminal sexual conduct (CSC-I), MCL 750.520b(1)(b)(*ii*) (sexual penetration of victim 13 to 15 years old and related to defendant by blood or affinity); three counts of second-degree criminal sexual conduct (CSC-II), MCL 750.520c(1)(b)(*ii*) (sexual contact with victim 13 to 15 years old and related to defendant by blood or affinity); one count of kidnapping, MCL 750.349(1)(c); and one count of second-degree child abuse, MCL 750.136b(3). On direct appeal, this Court affirmed defendant's convictions.[2]

In 2015, defendant filed his first MFRJ, arguing that his counsel at trial and on direct appeal rendered ineffective assistance by, among other things, failing to investigate and present expert DNA testimony and evidence that JN had made prior false allegations of sexual assault. Defendant attached affidavits in support, including from various members of his family regarding JN's prior allegations. The trial court denied the motion; in doing so, however, the court did not expressly

---

[1] *People v Northrop*, unpublished order of the Court of Appeals, entered December 11, 2023 (Docket No. 366293).

[2] *People v Northrop*, unpublished per curiam opinion of the Court of Appeals, issued May 13, 2014 (Docket No. 315972), lv den 497 Mich 947 (2014).

address the family members' affidavits. Both this Court and our Supreme Court denied relief on appeal.[3] Defendant then sought federal habeas relief, also unsuccessfully.[4]

In 2020, defendant filed a second MFRJ, which is the subject of the instant appeal. Defendant raised a wide range of claims and attached, in support, the affidavits he had submitted with his first MFRJ as well as other affidavits and materials. The trial court denied the motion under MCR 6.502(G), reasoning that the motion did not present any claim that had not been raised or could not have been raised previously. After this Court denied leave to appeal,[5] our Supreme Court issued an order remanding the matter to the trial court. The Court's order provided, in relevant part:

> Pursuant to MCR 7.305(H)(1), in lieu of granting leave to appeal, we VACATE the June 23, 2020 order of the Sanilac Circuit Court that denied the defendant's motion for relief from judgment, and we REMAND this case to the trial court for reconsideration of the defendant's motion under MCR 6.504(B). The trial court failed to consider the defendant's new evidence provided with his first motion for relief from judgment. On remand, the trial court shall determine whether the new evidence is credible and whether the impact of the new evidence, in conjunction with the evidence that would be presented on retrial, which may include newly discovered evidence presented in previous motions for relief from judgment, would make a different result probable on retrial. *People v Johnson*, 502 Mich 541, 566-567[; 918 NW2d 676 (2018)]. The motion to remand for an evidentiary hearing is DENIED. However, the trial court shall conduct such a hearing if it is required to appropriately resolve the defendant's motion. See MCR 6.508(C). [*People v Northrop*, 509 Mich 984, 984-985 (2022).]

On remand, the trial court held an evidentiary hearing and subsequently issued an opinion and order denying relief. As noted, this Court granted defendant's application for leave to appeal that decision. Defendant then filed an appellate brief, arguing that the trial court erred by denying his claims for relief based on newly discovered evidence and ineffective assistance of counsel. Finding no errors warranting reversal, we affirm.

---

[3] *People v Northrop*, unpublished order of the Court of Appeals, entered July 25, 2016 (Docket No. 331900); *People v Northrop*, unpublished order of the Michigan Supreme Court, entered January 5, 2017 (Docket No. 154201).

[4] *Northrop v Horton*, Case No. 17-11213 (ED Mich, 2019); *Northrop v Horton*, 779 F Appx 312 (CA 6, 2019).

[5] *People v Northrop*, unpublished order of the Court of Appeals, entered January 5, 2021 (Docket No. 354543).

## I. BACKGROUND

## A. EVIDENCE PRESENTED AT TRIAL

As this Court has previously summarized, see *People v Northrop*, unpublished per curiam opinion of the Court of Appeals, issued May 13, 2014 (Docket No. 315972), pp 1-4, the events leading to defendant's convictions occurred on February 13, 2012, when JN was 15 years old. JN testified at trial that, on that date, defendant kept her home from school as punishment for wearing makeup to school the week prior. According to JN, defendant approached her while she was watching television and attempted to duct tape her wrists and feet, but JN fought defendant off until he picked her up and carried her up the stairs to a bedroom. There, according to JN, she complied with defendant's direction to lie down while defendant wrapped her legs together in duct tape from her ankles to her knees and taped her wrists together. Defendant then took JN into another room on the same floor, laid her down on a blanket, put tied-together socks in her mouth, and told her that he was going to kill her, her mother, and her two brothers, NN and HN. Defendant also told her that his mother had said to him that JN did not look like she was his daughter, and that he had thought to himself that that was funny because he was raising his girlfriend. JN could smell alcohol on defendant, and she confirmed in her testimony that he had a drinking problem.

JN testified that defendant then went downstairs and that she heard a spraying noise. When defendant returned, he had a rag that smelled like chemicals, which he tried to hold to her nose. According to JN, she spit the socks out of her mouth, told defendant to stop while she moved around in a circle, and begged him to remove the duct tape, which he eventually did. After that, JN testified, she went to the downstairs bathroom; defendant followed her and began asking her to have sex with him, saying that he had been waiting to do so his whole life. Defendant then pulled JN from the couch where she was sitting, pushed her onto a bed that was stored in the living room, and removed their clothes. According to JN, defendant removed her tampon[6] and underwear, licked his fingers and rubbed her vagina, and then licked her vagina. He attempted a couple of times, unsuccessfully, to put his penis in her vagina until JN told him to stop and left to go to the bathroom and get a drink.

JN testified that, when she returned, she sat down on the couch again, but defendant pulled her back onto the bed, put on a condom, and put his penis in her vagina for about 10 minutes. According to JN, defendant threatened to "tie me on my bed and do it from my back until my butt started bleeding," and said that he was going to get her pregnant but not until she was older. Afterwards, JN went to the bathroom, and then got dressed in the same clothes she previously wore. According to JN, she experienced bleeding when she went to the bathroom, but no blood got onto her underwear. JN testified that after the assault, defendant brought the bedding to the washer and dryer in the basement.

Jennifer Toler, the mother of JN and her two brothers, testified at trial that she and defendant had been together for 20 years. According to Toler, their romantic life had been poor for "quite a while," defendant had been drinking a lot, and she "didn't enjoy his company when he

---

[6] JN testified that she was menstruating at the time of the assault.

-3-

drank." Toler testified that defendant made JN stay home on the day in question because JN had worn makeup to school and that when Toler returned home from work that day, defendant appeared intoxicated. Toler and JN both testified that, when Toler then took JN to pick up HN from the bus stop, JN began crying and told Toler that defendant had raped her. Toler took JN and her two brothers to a nearby McDonald's, where she checked JN's underwear; she did not see any blood or sign of injury. She then dropped off HN with her sister and brought JN, along with NN, to the police station, hospital, and ultimately a children's advocacy center where JN was examined and some of her clothes were collected. The examining nurse testified at trial that the examination did not reveal any injuries to JN and that JN's hymen remained intact. According to the nurse, it was not uncommon to see a lack of physical injuries on a victim of sexual assault. The nurse also collected several swabs from JN which were received by Michigan State Police (MSP) Trooper Jeffrey Rodgers. Toler testified that she returned to the house the following week to collect her things and found a blanket in the dryer that was JN's; at trial, JN identified the blanket as one used during the assault.

Galen Krawczak, defendant's friend and neighbor, testified at trial that he received a phone call from defendant on the evening of February 13, 2012. According to Krawczak, defendant told him that something bad was going to happen and that he needed a ride to Kentucky. Krawczak testified that defendant sounded drunk and that he told defendant to lie down and cool off. NN also testified at trial regarding text messages that he and defendant exchanged the evening of February 13, while NN was with Toler and JN; photographs of the text messages were entered into evidence. In the text messages, defendant and NN expressed distress about what was happening.

In the early morning of February 14, 2012, officers executed a search warrant on defendant's house. When officers entered the home, defendant was intoxicated and asleep on the couch. Several items were recovered from the home, including a green rag from an upstairs hall closet (which, according to JN, resembled the one defendant had tried to hold to her nose), balled-up duct tape found under JN's bed, and a bottle of starter fluid from the kitchen located on the main level of the house. There was no evidence that a tampon, a condom, or blood was found. Trooper Rodgers testified that he returned to the home later that evening to arrest defendant but that no one answered the door. Using GPS, Trooper Rodgers located defendant's phone a quarter of a mile away in a field. Defendant was eventually found in the house and arrested.

Officers took DNA samples from defendant's mouth and penis. At trial, MSP forensic examiner Cassandra Campbell testified about the results of her comparison between defendant's DNA sample and the sample taken from JN's inner thigh. Due to a lack of DNA, Campbell was only able to test 3 of 11 locations on the "Y" chromosome, and determined that two locations matched defendant's sample, but the third could not be determined. She explained that one of every two Caucasian males could have the same "Y" DNA markers. Accordingly, Campbell testified, no conclusive determination could be made as to whether defendant's DNA matched that of the sample taken from JN's thigh.

MSP forensic scientist Valerie Bowman testified that swabs from JN's vaginal and inner thigh areas did not contain semen, but did contain alpha-amylase, an enzyme that is found in high quantities in saliva. MSP forensic scientist Heather Clark testified that JN's inner thigh swab identified JN as the major DNA donor. The sample also contained DNA from a minor, male donor, but the sample was insufficient to establish whether defendant was the minor donor. Clark testified

that no DNA foreign to defendant was detected in defendant's penile swab. The swab from defendant's underwear contained at least three donors but, Clark explained, the sample was insufficient to provide any further identification.

In addition to the DNA evidence, the jury heard testimony from the prosecution's fingerprint expert, who testified that a complete thumbprint from defendant was retrieved from the lengths of wadded-up duct tape recovered from the house, along with some partial fingerprints which could not be identified. A fibers expert also testified at trial that there were no differences detected between the red fibers found on the duct tape and the red sweatshirt JN was wearing the day of the incident but that, because the kinds of fibers found were widely used, the expert could not conclusively determine whether they came from JN's sweatshirt.

Defendant testified at trial and denied the allegations against him. Defendant testified that he and JN were both home on the day in question but that he did not force her to stay home that day, nor did he interact with her during the day. According to defendant, he did not go to work that day due to a bad headache and cold; instead, he slept, took Nyquil, and drank coffee and a beer over the course of the day.[7] Defendant maintained that, both due to his bad back and given the size of the stairwell, he would not have been able to carry JN up the stairs as she claimed he did.[8] Defendant also testified that JN regularly fabricated stories at school and was "constantly grounded" as a result. Defendant described one particular instance when JN had previously made a false allegation that a teacher at her school touched her inappropriately and told her that he wanted her to have his babies. Defendant testified that he did not recall calling Krawczak and suggested that Krawczak was dating JN's mother, Toler. Defendant also did not know how or why his cell phone may have ended up in a field. Defendant denied that he had previously admitted to using duct tape on his children as punishment.

During her testimony, Toler denied that JN's school had ever called her about any allegations JN had made about teachers. When called as a rebuttal witness, JN testified that she had given a written statement for her friend regarding a teacher looking down her friend's shirt at school, though she did not herself see it happen; she denied that she had ever made any allegations regarding a teacher touching her inappropriately. JN also testified during her direct examination that defendant had previously wrapped her and one of her brothers up in duct tape. And on rebuttal, jurors heard a portion of an interview that officers conducted with defendant on the night they searched the home, in which defendant told officers that he would wrap the children up in duct tape "burritos" and then sometimes "stick them together . . . so they can . . . stick their tongues out and stuff at each other."

---

[7] Defendant also testified that he had consumed beer, peppermint schnapps, and shots of absinthe alcohol the day before the events in question, and that he finished the bottle of absinthe the day after the events in question.

[8] In her testimony, JN confirmed defendant had back problems, but said he could still lift things.

## B. DEFENDANT'S OFFERED NEW EVIDENCE

In the instant appeal, defendant's request for postjudgment relief centers around his claim of new evidence. Defendant first proposes to provide his own expert testimony regarding the DNA evidence, which he contends would rebut the prosecution's theory regarding the significance of that evidence. Defendant also proposes to provide testimony from several of his family members that JN has a history of making up false allegations of sexual assault against other family members: namely, that JN had previously accused (1) her paternal grandmother of fondling her, (2) her paternal grandfather of inappropriately touching her leg, (3) her paternal uncle of touching her inappropriately while wrestling with her, and (4) her maternal grandfather of putting her hand on his crotch. The offered testimony indicates that, with one exception, defendant and NN were the only individuals who directly heard JN make these allegations.[9] The testimony also indicates that JN recanted the allegations when confronted and often passed them off as jokes. According to the testimony, all of defendant's proffered witnesses regarding these allegations knew of them before trial and several of the witnesses attempted to bring them up with defendant's trial counsel, who did not inquire at trial into any prior false allegations other than those involving a teacher.

In addition, defendant seeks to present evidence at retrial regarding his strained relationship with JN and Toler and JN's possible motivation for making false allegations against him, including evidence of a custody dispute between defendant and Toler from 2002.[10] The proposed evidence also includes testimony regarding defendant's strict parenting of JN, as well as an incident that occurred prior to the conduct at issue in which defendant took JN to work with him after she was suspended from school. According to defendant, JN did not want to work, pretended to cry, and threatened to call the police to get rid of defendant by accusing him of rape.

Defendant also proposes to provide a fuller explanation of the "burrito game"—namely, that it was an activity that he and the children engaged in for fun. And defendant proposes to introduce evidence that JN did not cry for the entirety of her forensic interview, contrary to the trial testimony of the forensic interviewer.

## C. THE TRIAL COURT'S RULING

As noted, the trial court, upon remand from our Supreme Court, opted to hold an evidentiary hearing at which it heard testimony from various witnesses, including defendant, Toler,[11] and JN's family members. The court thereafter issued a written opinion and order reviewing that testimony and other evidence offered by defendant and denying defendant's request

---

[9] JN's paternal grandmother testified that she also heard JN make the fourth allegation regarding JN's maternal grandfather.

[10] Defendant posits that this evidence would not only provide proof of motive, but also impugn Toler's credibility as a witness.

[11] By the time of the evidentiary hearing, Toler's last name had changed to Saj. For clarity and consistency, we will refer to her as Toler throughout this opinion.

for relief. The trial court first noted that the Supreme Court's remand order had described defendant's evidence as "new," but not as "newly discovered," and then determined that the evidence did not meet that latter standard. The court further concluded that, even if the evidence were newly discovered, defendant failed to show that it would make a different result probable on retrial. The trial court also rejected defendant's claim of ineffective assistance of counsel, deeming it both outside the scope of the Supreme Court's remand order and meritless in any event.[12] Defendant then filed a motion for reconsideration, which the trial court substantively addressed and denied in a written order. This appeal followed.

## II. STANDARD OF REVIEW

"This Court reviews a trial court's decision to grant or deny a motion for a new trial for an abuse of discretion." *Johnson*, 502 Mich at 564. A trial court abuses its discretion "when it makes an error of law" or "when its decision falls outside the range of reasonable and principled outcomes." *People v Duncan*, 494 Mich 713, 722-723; 835 NW2d 399 (2013). Underlying questions of law are reviewed de novo, *id.* at 723, while "[a] trial court's factual findings are reviewed for clear error," *Johnson*, 502 Mich at 565. "Clear error occurs if the reviewing court is left with a definite and firm conviction that the trial court made a mistake." *Id.* (quotation marks and citation omitted). In performing this review, we give due regard to the "special opportunity of the trial court to judge the credibility of the witnesses who appeared before it." MCR 2.613(C).

## III. NEWLY DISCOVERED EVIDENCE

Defendant's primary argument on appeal is that the trial court erred by concluding that his offered evidence is insufficient to warrant relief. For a new trial to be granted on the basis of this evidence, defendant must show that: "(1) the evidence itself, not merely its materiality, was newly discovered; (2) the newly discovered evidence was not cumulative, (3) the party could not, using reasonable diligence, have discovered and produced the evidence at trial; and (4) the new evidence makes a different result probable on retrial." *People v Cress*, 468 Mich 678, 692; 664 NW2d 174 (2003) (quotation marks and citations omitted); see also *People v Grissom*, 492 Mich 296, 317-319, 321; 821 NW2d 50 (2012) (holding that impeachment evidence can be adequate to entitle a defendant to relief under the *Cress* test). Defendant bears the burden on all parts of this *Cress* test. *People v Rao*, 491 Mich 271, 289; 815 NW2d 105 (2012).

As a threshold matter, defendant contends that our Supreme Court's remand order, through its reference to his "new evidence," determined that his offered evidence was "newly discovered" for purposes of the *Cress* test, thereby foreclosing the trial court (and this Court) from concluding otherwise. We agree that, by remanding the matter as it did, the Supreme Court has indicated that defendant has offered "new evidence" sufficient to surmount MCR 6.502(G)(2)'s procedural filing bar for successive MFRJs such as the instant one. Like the trial court, however, we are not inclined further read into the Court's order a conclusive determination that the evidence satisfies any particular portion of the *Cress* test. See, e.g., *People v Swain*, 499 Mich 920, 920 (2016) (explaining that the "new evidence" inquiry of MCR 6.502(G) is distinct from the *Cress* test, which

---

[12] The trial court also addressed other claims from defendant's first and second MFRJs, whose resolution defendant does not challenge on appeal.

"does not apply to the procedural threshold of MCR 6.502(G)(2)"). Ultimately, we need not definitively resolve this point of contention because, for the reasons discussed below, defendant has not shown entitlement to relief on the basis of the evidence in question even if it is considered "newly discovered" under *Cress*. For the sake of completeness, however, we will address defendant's offered evidence under all four prongs of the *Cress* test.

## A. FIRST THREE *CRESS* PRONGS

Consistent with the first three prongs of the *Cress* test, we begin with analyzing whether defendant's offered evidence was newly discovered and not cumulative, and could not have been discovered and produced at trial with the exercise of reasonable diligence. See *Cress*, 468 Mich at 692. We conclude that defendant has failed to meet these requirements. As the trial court observed, nearly all of the evidence defendant seeks to present on retrial was not newly discovered because it was known to defendant prior to trial, and much of it was communicated to defendant's counsel at that time as well. See *Rao*, 491 Mich at 281 ("Michigan caselaw makes clear that evidence is not newly discovered if the defendant or defense counsel was aware of the evidence at the time of trial."). Defendant's testimony at the evidentiary hearing confirmed that, before trial, he personally knew that JN had made prior false allegations regarding four family members, either because he personally heard JN make the allegation or personally heard her recant the allegation. The testimony at the evidentiary hearing also established that trial counsel knew about many, if not all, of the prior false allegations before trial as well. NN, as well as two other family members, testified that they told trial counsel about prior false allegations made by JN. Similarly, defendant testified at the evidentiary hearing that he personally heard JN threaten to accuse him of rape prior to his trial and that he told trial counsel about the threat. Defendant's personal knowledge of the evidence regarding the "burrito game," of his custody dispute with Toler,[13] and of his strict parenting of JN[14] likewise forecloses a finding that any of this evidence was "newly discovered."

Defendant's new DNA evidence may well be newly discovered, but it is runs into difficulties with *Cress*'s second prong, which requires that it not be cumulative of the evidence presented at trial. Defendant seeks to introduce expert testimony explaining that the DNA evidence could have come from one of defendant's male relatives and could be consistent with secondary cell transfer from other items. Defendant's expert would also testify that the alpha-amylase found on JN's inner thigh could have originated from a source other than saliva, such as feces or vomit. This evidence goes beyond the DNA evidence presented at trial to some extent (namely, as to other conceivable sources of alpha-amylase), and so it is not entirely cumulative. But as the trial court recognized—in denying both the instant MFRJ and defendant's first one— this evidence ultimately shows what the trial evidence did: that the DNA evidence in this case is inconclusive. The prosecution's expert testimony did not purport to show that the evidence conclusively came from defendant, and defendant's counsel emphasized the lack of conclusive DNA evidence during his cross-examination of the witnesses and in his closing argument.

---

[13] Defendant's trial counsel also represented defendant in the custody dispute.

[14] Defendant's strict parenting of JN was also discussed at trial.

Furthermore, defendant has failed to demonstrate that any of his offered evidence—newly discovered or otherwise—could not have been, through the exercise of reasonable diligence, discovered and produced at trial. See *Cress*, 468 Mich at 692. Defendant notes, with respect to this third *Cress* prong, that he and his family members exercised reasonable diligence to make trial counsel aware of much of this evidence. That may bear on whether trial counsel was ineffective with respect to such evidence, but we do not see how it would change the fact that, for purposes of the *Cress* test, the evidence was not newly discovered; if anything, it seems only to confirm as much. See *Rao*, 491 Mich at 273, 281. Defendant has thus failed to satisfy the first three prongs of the *Cress* test, and we see no abuse of discretion in the trial court's conclusions to that effect.

## B. FOURTH *CRESS* PRONG

While defendant's failures under the first three *Cress* prongs would ordinarily be dispositive in themselves, our inquiry in this case continues to the fourth prong in light of our Supreme Court's remand order, which specifically directed the trial court to determine whether defendant's "new evidence is credible" and whether it, in conjunction with the evidence that would be presented on retrial, "would make a different result probable on retrial." These inquiries are interrelated. "In order to determine whether newly discovered evidence makes a different result probable on retrial, a trial court must first determine whether the evidence is credible." *Johnson*, 502 Mich at 566-567.

In assessing the credibility of the new evidence in this context, the trial court's function is limited, "as it is not the ultimate fact-finder." *Id.* at 567. The trial court's credibility determination "is concerned with whether a *reasonable juror* could find the testimony credible on retrial." *Id*. Accordingly, "[i]f a witness's lack of credibility is such that *no* reasonable juror would consciously entertain a reasonable belief in the witness's veracity, then the trial court should deny a defendant's motion for relief from judgment." *Id.* at 568. But "if a witness is not patently incredible, a trial court's credibility determination must bear in mind what a reasonable juror might make of the testimony, and not what the trial court itself might decide, were it the ultimate fact-finder." *Id*.

The trial court in this case found that testimony offered by defendant and his various family members was not credible. It is not clear that the court intended this to amount to a determination that all of the testimony was patently incredible or that "*no* reasonable juror would consciously entertain a reasonable belief" in any of its veracity, *id*., but we note that we would disagree with such a conclusion. For instance, the trial court found that certain family members were not credible seemingly because they lacked personal knowledge of the accusations JN had purportedly made against them; while that consideration may well bear on the testimony's admissibility and weight, we do not believe it would have rendered the testimony "patently incredible." *Id*. Similarly, the trial court found that NN's testimony was not credible because he testified about JN's prior false allegations against family members but also testified that JN gave a truthful witness statement to police regarding an incident where NN was sexually abused by a non-family member (namely, a relative of Toler's former boyfriend). A reasonable juror could take NN's differing assessments of JN's honesty as undermining his credibility. But we fail to see how those differing assessments would render NN's testimony so incredible "that *no* reasonable juror would consciously entertain a reasonable belief in [NN's] veracity[.]" *Id*.

-9-

That defendant's offered testimony was not patently incredible, however, does not mean that defendant is entitled to relief on its basis; it simply means that the court must proceed to consider the testimony as part of its evaluation of whether, under *Cress*'s fourth prong, a different result is probable on retrial—"bear[ing] in mind what a reasonable juror might make of the testimony, and not what the trial court itself might decide, were it the ultimate fact-finder." *Id.* And considering this evidence and the other evidence that would be admitted at retrial, we agree with the trial court's conclusion that defendant has failed to show that a different result is probable. See *id*. at 571; *Cress*, 468 Mich at 692.

As to his evidence of JN's prior false allegations, defendant stresses that, at trial, there was no evidence presented that impeached JN; this new evidence, meanwhile, attacks JN's credibility and supports defendant's theory that she is habitual liar. As noted, however, defendant did offer testimony at trial impugning JN's credibility and portraying her as routinely fabricating stories, including about sexual misconduct. Defendant's offered evidence would add to that line of attack, but as the trial court recognized, it is also sourced almost entirely from defendant himself and his son NN, with only one other family member claiming any direct knowledge of any of the allegations and with no further investigation or corroboration as to any of them. While such considerations may not have been enough to render the evidence patently incredible, they do inform—and limit—just how much weight a reasonable juror would likely afford that evidence.

And as the trial court also observed, the evidence itself cuts both ways. Even assuming it is believed and admissible,[15] the evidence establishes that JN had a propensity for claiming that family members touched her inappropriately and then recanting those claims when confronted. But that pattern of behavior stands in contrast to JN's conduct in the instant case. JN has never recanted her allegation against defendant in this case, even when pressed to do so by defendant and NN. To the contrary, her account of defendant's conduct has remained consistent, and nothing in defendant's offered evidence suggests otherwise. Furthermore, none of the prior allegations were ever escalated to law enforcement, whereas here JN went to the police and underwent a physical examination. And defendant and NN also both testified to instances where they believed JN had been truthful regarding allegations of sexual abuse against individuals other than defendant and his family members (namely, family members of Toler and of her former boyfriend), including an instance where NN had been the victim and police had become involved. Accordingly, it is far from clear that defendant's offered evidence would meaningfully impeach JN's credibility as to her allegation against defendant in this case, and may instead even serve to bolster it.

Defendant's offered evidence would similarly reveal a contrast between his behavior following JN's allegation in this case and his reaction to JN's prior false allegations against him and his family members. The evidence indicated that defendant, when met with false allegations by JN about his family members, responded by punishing JN for lying but not otherwise expressing

---

[15] The parties dispute the admissibility of defendant's proffered evidence regarding the prior false allegations, and defendant acknowledges that at least parts of his offered evidence would be inadmissible hearsay. We ultimately need not resolve this dispute because, for the reasons discussed, we conclude that the proffered evidence, even if assumed to be admissible, does not warrant relief.

-10-

particular concern, and when JN threatened to falsely accuse him of rape, defendant testified that he laughed and "said well I dare ya." Meanwhile, in response to JN's allegation of rape in this case, the evidence at trial indicated that defendant traded text messages with NN reflecting distress, called a friend for a ride out of the state, and then somehow became separated from his phone, which was later found abandoned in a field. While defendant's reaction could conceivably be viewed as consistent with his theory that JN falsely accused him, his offered evidence does not particularly strengthen that conclusion, and at least arguably undercuts it.

The other new evidence defendant seeks to admit does not fare significantly better. Defendant's new DNA evidence lends some support to his case, but as discussed, a good deal of it is cumulative of the evidence at trial, which itself could not conclusively establish that defendant's DNA was found on JN following her examination. Evidence that JN may have been motivated to make a false allegation against defendant because of his strict parenting is also largely cumulative. Indeed, defendant testified at trial that he was "overly protective or strict" as a parent and that JN was "constantly grounded." Testimony at trial also indicated that defendant's and Toler's relationship was strained. And as to defendant's offered evidence of his custody dispute with Toler, the dispute itself occurred roughly a decade before the events at issue in this case and defendant has failed to meaningfully substantiate his theory that it would have motivated JN, many years later, to fabricate a sexual assault so that he would be sent to prison. Defendant suggests that JN wanted to help Toler regain custody, but offers no evidence of any specific dispute over custody at the time of events at issue in this case. Defendant stresses that: (1) at the evidentiary hearing, JN's paternal grandmother (defendant's mother, and one of the claimed subjects of JN's prior false allegations) testified that she had heard Toler say that Toler wanted to leave defendant; and (2) NN, in a January 2020 affidavit, stated that Toler, JN, and defendant were "always fighting" and that Toler and JN had "said they wish [defendant] was dead. 'They need to get rid of him.' " Defendant, however, has not explained how the portions of such testimony about JN's and Toler's claimed out-of-court statements would be admissible at retrial. Furthermore (and similar to the evidence of JN's prior false allegations against defendant's family members), it is questionable just how much weight a reasonable juror would afford this testimony, given that it sourced from NN and defendant's mother. And finally, it is not clear what, if any, connection this testimony might have to the custody dispute in 2002.[16]

---

[16] Defendant's offered evidence indicates that the dispute itself arose from allegations by JN that Toler's then-boyfriend and his family members had engaged in inappropriate conduct with or around JN and her brothers, including that the boyfriend's son had "threatened or forced sexual acts upon" them. NN testified that JN had been truthful in this regard and that the boyfriend's son had sexually abused him. Defendant seems to suggest that Toler may have wanted to get back at defendant for taking action on these allegations, but fails to substantiate such a suggestion. Defendant also argues that Toler's testimony about this dispute at the evidentiary hearing severely undermined her credibility because she denied being aware that JN had made allegations against the then-boyfriend and his brother even when confronted with documents from the dispute. It is not obvious, however, that Toler's testimony was necessarily at odds with what was determined in the custody dispute; for instance, if the dispute was resolved based on the abuse of NN by the boyfriend's son, it is not clear that Toler necessarily denied knowledge of allegations by JN to that

-11-

Defendant's proposed additional testimony about the playful nature of the "burrito game" also adds little substantive value, as the fact that defendant may have used duct tape on his children playfully in the past does not particularly undermine the notion that he did so maliciously in this instance. Nor is there anything to indicate that challenging the forensic interviewer about whether JN cried for all of her forensic interview or instead for only some of it would meaningfully aid defendant's case; rather, it may only serve to focus the jury's attention (and sympathy) on the general fact that JN was at times visibly upset during the interview.

In sum, defendant has identified evidence that could yield some benefit to his case on retrial in certain respects, but could also harm it in others. Much of this evidence is either cumulative, speculative, or sourced solely from defendant and his supportive son and mother. And none of it directly contradicts JN's unwavering account of the specific conduct at issue in this case and the evidence at trial, physical and otherwise, that corroborated or was consistent with it. On this record, it is conceivable that, if defendant were to be tried again, a jury might decline to convict him of some or all of the charged offenses. But to undo the jury's prior determination of his guilt and secure a new trial, defendant must show that, based on the evidence that would be admitted at retrial, a different result would not merely be possible, but "probable." *Cress*, 468 Mich at 692. He has not done so. Accordingly, even if defendant had satisfied the first three prongs of the *Cress* test, he has failed to satisfy its fourth, and we do not see reversible error in the trial court's ultimate conclusion to that effect. See *Johnson*, 502 Mich at 564-565; *Duncan*, 494 Mich at 722-723.

## IV. INEFFECTIVE ASSISTANCE OF COUNSEL

Finally, defendant argues that he received ineffective assistance of trial counsel because his trial counsel failed to investigate and present the evidence discussed above. Whether counsel was ineffective presents a mixed question of fact and law, with factual findings reviewed for clear error and questions of law reviewed de novo. *People v Head*, 323 Mich App 526, 539; 917 NW2d 752 (2018). "To establish ineffective assistance of counsel, a defendant must show (1) that counsel's performance fell below an objective standard of reasonableness under prevailing professional norms and (2) that there is a reasonable probability that, but for counsel's error, the result of the proceedings would have been different." *People v Shaw*, 315 Mich App 668, 672; 892 NW2d 15 (2016). This Court presumes counsel was effective, and a defendant carries a heavy burden to overcome that presumption. *People v Muniz*, 343 Mich App 437, 448; 997 NW2d 325 (2022).

As the trial court noted, defendant's claim of ineffective assistance of counsel does not appear to fall within the scope of the remand order from our Supreme Court. Nonetheless, the trial court reviewed this claim on its merits and found it lacking. We agree with that conclusion. Even

---

effect. Nor, for that matter, it is clear that a reasonable juror would view any such discrepancy in her testimony about that distant dispute as significantly compromising her credibility regarding the events at issue in this case, let alone the integrity of JN's account of those events and the other evidence supporting it.

setting aside whether counsel performed deficiently in any respect,[17] we conclude, for the same fundamental reasons that defendant's evidence would not make a different result probable on retrial, that defendant has failed to show a reasonable probability of a different outcome at trial had counsel sought to present the evidence. Accordingly, even assuming this claim falls within the scope of the Supreme Court's remand, defendant has not demonstrated entitlement to relief on its basis.[18]

Affirmed.

/s/ Philip P. Mariani
/s/ Michael J. Riordan
/s/ Kathleen A. Feeney

---

[17] This is not to say that we believe counsel did perform deficiently, or that we see error in the trial court's assessment otherwise—just that we need not reach the issue in order to resolve defendant's claim on appeal.

[18] Defendant has also filed with this Court a renewed motion to remand this matter to the trial court for a *Ginther* hearing on his ineffective-assistance claim. See *People v Ginther*, 390 Mich 436; 212 NW2d 922 (1973). This Court previously denied without prejudice defendant's motion for such a hearing. See *People v Northrop*, unpublished order of the Court of Appeals, entered April 26, 2024 (Docket No. 366293). Upon plenary review of defendant's claim, and in light of our analysis of defendant's offered evidence above, we do not see "any issue for which further factual development would advance [defendant's] claim" or any other reason why defendant's requested remand would be necessary to properly dispose of the claim on appeal. *People v Chapo*, 283 Mich App 360, 369; 770 NW2d 68 (2009).

-13-